**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

> FILED IN CLERK'S OFFICE
> U.S.D.C. - Atlanta
>
> MAR 0 3 2023
>
> KEVIN P. WEIMER, Clerk
> BY: _____ Deputy Clerk

Maria Victoria Barlow
_____

Plaintiff *pro se,*

v.

Deloitte Consulting LLP, GA;
_____

Deloitte Consulting LLP, NY;
_____

Deloitte L.P, NY; & Deloitte LLP, NY
_____

(Print full name of each defendant; an
employer is usually the defendant)

Defendant(s).

CIVIL ACTION FILE NO.

**1:23-CV-0932**

(to be assigned by Clerk)

---

### *PRO SE* EMPLOYMENT DISCRIMINATION COMPLAINT FORM

#### Claims and Jurisdiction

1.  This employment discrimination lawsuit is brought under (check only those that apply):

    ✓    Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.,* for employment discrimination on the basis of race, color, religion, sex, or national origin, or retaliation for exercising rights under this statute.

         **NOTE:** To sue under Title VII, you generally must have received a notice of right-to-sue letter from the Equal Employment Opportunity Commission ("EEOC").

_____ Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621 et seq., for employment discrimination against persons age 40 and over, or retaliation for exercising rights under this statute.

> **NOTE:** To sue under the Age Discrimination in Employment Act, you generally must first file a charge of discrimination with the EEOC.

_____ Americans With Disabilities Act of 1990, 42 U.S.C. §§ 12101 et seq., for employment discrimination on the basis of disability, or retaliation for exercising rights under this statute.

> **NOTE:** To sue under the Americans With Disabilities Act, you generally must have received a notice of right-to-sue letter from the EEOC.

_____ Other (describe) _____

_____

_____

_____

_____

_____

2.    This Court has subject matter jurisdiction over this case under the above-listed statutes and under 28 U.S.C. §§ 1331 and 1343.

## Parties

3. Plaintiff. Print your full name and mailing address below:

   Name      Maria Victoria Barlow

   Address      1029 Oak Street SW, Atlanta GA 30310


4. Defendant(s).      Print below the name and address of each defendant listed on page 1 of this form:

   Name      Deloitte Consulting LLP

   Address      30 ROCKEFELLER PLAZA, NEW YORK, NY, 10112-0015, USA

   Name      Deloitte Consulting LLP

   Address      191 PEACHTREE STREET, N.E., STE 2000, ATLANTA, GA 30303

   Name      Deloitte Consulting L.P

   Address      80 STATE ST., ALBANY, NY, UNITED STATES, 12207 - 2543

   Name      Deloitte LLP

   Address      80 STATE ST., ALBANY, NY, UNITED STATES, 12207 - 2543

## Location and Time

5. If the alleged discriminatory conduct occurred at a location different from the address provided for defendant(s), state where that discrimination occurred:

   Discrimination took place at defendants' address, virtual work environments,

   and in the Atlanta area at various client sites

6.     When did the alleged discrimination occur?  (State date or time period)

May 10, 2015 - November 21, 2021

_____

_____

_____

### Administrative Procedures

7.     Did you file a charge of discrimination against defendant(s) with the EEOC or
       any other federal agency?          ✓    Yes           __    No

            If you checked "Yes," attach a copy of the charge to this complaint.

8.     Have you received a Notice of Right-to-Sue letter from the EEOC?

       ✓    Yes          _____No

            If you checked "Yes," attach a copy of that letter to this complaint and
            state   the   date   on   which   you   received   that   letter:
            **December 8, 2022**

9.     If you are suing for **age discrimination,** check one of the following:

            _____          60 days or more have elapsed since I filed my charge of age
                            discrimination with the EEOC

            _____          Less than 60 days have passed since I filed my charge of age
                            discrimination with the EEOC

10. If you were employed by an agency of the State of Georgia or unsuccessfully sought employment with a State agency, did you file a complaint against defendant(s) with the Georgia Commission on Equal Opportunity?

  --   Yes    --   No    ✓   Not applicable, because I was not an employee of, or applicant with, a State agency.

If you checked "Yes," attach a copy of the complaint you filed with the Georgia Commission on Equal Opportunity and describe below what happened with it (i.e., the complaint was dismissed, there was a hearing before a special master, or there was an appeal to Superior Court):

_____

_____

11. If you were employed by a Federal agency or unsuccessfully sought employment with a Federal agency, did you complete the administrative process established by that agency for persons alleging denial of equal employment opportunity?

  --   Yes    --   No    ✓   Not applicable, because I was not an employee of, or applicant with, a Federal agency.

If you checked "Yes," describe below what happened m that administrative process:

_____

_____

## **Nature of the Case**

12. The conduct complained about in this lawsuit involves (check only those that apply):

   _____   failure to hire me
   __✓___   failure to promote me
   _____   demotion
   _____   reduction in my wages
   __✓___   working under terms and conditions of employment that differed from similarly situated employees
   _____   harassment
   __✓___   retaliation
   _____   termination of my employment
   _____   failure to accommodate my disability
   _____   other (please specify) _____

13. I believe that I was discriminated against because of (check only those that apply):

   __✓___   my race or color, which is <u>Black</u>_____
   _____   my religion, which is _____
   __✓___   my sex (gender), which is            male           ✓ female
   _____   my national origin, which is _____
   _____   my age (my date of birth is _____.
   _____   my disability or perceived disability, which is:

   _____   my opposition to a practice of my employer that I believe violated the federal anti-discrimination laws or my participation in an EEOC investigation

   _____   other (please specify) _____

14. Write below, as clearly as possible, the essential facts of your claim(s). Describe specifically the conduct that you believe was discriminatory or retaliatory and how each defendant was involved. Include any facts which show that the actions you are complaining about were discriminatory or retaliatory. Take time to organize your statements; you may use numbered paragraphs if you find that helpful. Do not make legal arguments or cite cases or statutes.

My employer removed me from a client project in January 2021 that was a primary requirement for promotion to manager without cause and at the request of a white colleague.

This was regardless of managers verbal support for the advancement to manager in the late fall of 2020.

Management did not provide support in finding alternative placement to avoid the promotion hinderance impact.

Respondent also discriminated against me with respect to the terms and conditions of my employment because of my race (African American) and gender (Female) discrimination and my complaints about discrimination. In particular, I believe Respondent treated me differently than my Caucasian counterparts by:

(a) paying me less than my white male counterparts relative to my initial pay, bonuses and pay increases;

(b) engaging in discriminatory "snap shots" and/or performance reviews;

(c) holding me to different standards, work rules, and expectations;

(d) undermining my value and authority by, among other things, allowing team members to bypass me and otherwise ignore my instructions;

(e) failing to support me;

(f) unreasonably scrutinizing my interactions with my colleagues;

(g) chastising me for infractions I did not commit; and

(h) otherwise treating me differently than my male Caucasian counterparts.

I believe the Respondent discriminated and retaliated against me because of my race (African-American), gender (Female) and complaints about disparate treatment in violation of Title VII of the Civil Rights Act and other applicable law when it: failed to promote me to a manager position; failed to pay me equally as the Caucasian men with respect to my initial pay, bonuses, and pay increases; and otherwise treated me differently with respect to the terms and conditions of my employment.

The asserted reasons for Respondent's actions are pretext for unlawful discrimination and retaliation.

In February 2021 and again on August 8, 2021 I formally complained about the disparate treatment to

Respondent's Human Resources. I had previously complained to several management officials from May-October 2020. Despite my complaints, the disparate treatment continued and ultimately caused me to suffer severe emotional distress. Respondent's actions both caused my medical condition and resulted in me being forced to take a medical leave of absence from work in April 2021.

Below is a timeline of events and exhibits documenting those events:

05/15/2015 – Pay discrepancy between male peers and Maria upon entering firm

11/2018 – 7/2019 - Disparate treatment on Project 1 (See Exhibit C page 28)

12/2019 - Maria begins Project 2 (See Exhibit C page 29)

5/2020-10/2020 – Disparate treatment on Project 2 and Maria's complaints to management, no response

11/2021 -1/2021 – Maria is given verbal confirmation on readiness and support for promotion
By 2 senior managers and 1 manager with Coach present

1/11/2021 – Maria is removed from project without cause

2/16/2021 – Maria reports disparate treatment to Deloitte ethics hotline

3/31/2021 - Deloitte gives investigation conclusion to Maria through Wendy Stiener

4/19/2021 - Maria took leave of absence due to medical disability

7/21/2021 – Deloitte releases promotion decisions to entire staff

8/8/2021 – Maria's Follow-Up Complaint Letter sent to Deloitte HR (See Exhibit C page 27)

10/25/2021 – EEOC Charge Initiated

1/5/2022 – EEOC Charge Signed (See Exhibit A)

3/14/2022 - EEOC Enters Mediation

3/23/2022 - EEOC Charge Amended (See Exhibit C page 22)

3/24/2022 - EEOC Enters Investigation Phase

6/1/2022 - EEOC receives Defendant's Position Statement (See Exhibit B)

6/13/2022 - Maria returns to work at 50% due to impacts from disability

8/22/2022 -EEOC releases Defendant's Position Statement to Maria Barlow

9/29/2022 - EEOC receives "Response to Deloitte Consulting LLC. in the matter of Maria Barlow's EEOC Charge #410-2022-00525" from Maria Barlow (See Exhibit C)

12/8/2022 - EEOC Issues Right to Sue to Maria Barlow (See Exhibit D)

I retain the right to obtain counsel and have intent to do so. I am also requesting a Jury Trial.

I am requesting $1,557,043 in damages; as well as the directive of the following: 1.Promote me to manager retroactively to September 2021

2.    Provide me with executive coaching from a coach of my choosing for 2 years

3.    Give support to Black Women specifically serving in the Atlanta area

Exhibit A: Charge of Discrimination

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA | |
| | ☒ EEOC | 410-2022-00525 |
| | | and EEOC |

State or local Agency, if any

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone | Year of Birth |
|---|---|---|
| **MISS MARIA V BARLOW** | **(313) 806-3764** | **1988** |

| Street Address | City, State and ZIP Code | | |
|---|---|---|---|
| **981 MAYSON TURNER RD. N.W., ATLANTA,GA 30314** | | | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. |
|---|---|---|
| **DELOITTE CONSULTING LLP** | **201 - 500** | **(404) 631-2000** |

| Street Address | City, State and ZIP Code |
|---|---|
| **191 PEACHTREE STREET, N.E., STE 2000, ATLANTA, GA 30303** | |

| Name | No. Employees, Members | Phone No. |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

DATE(S) DISCRIMINATION TOOK PLACE
Earliest                    Latest

**01-15-2021        11-21-2021**

☒ RACE   ☐ COLOR   ☒ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN

☒ RETALIATION   ☐ AGE   ☐ DISABILITY   ☐ GENETIC INFORMATION

☐ OTHER *(Specify)*

☒ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

**On May 10, 2015, I was hired by the above-named employer. My most recent position is Senior Consultant. On February 8, 2021, I spoke with an Investigator of my employer to report an ethical infraction concerning a co-worker of a different protected category (Category). Prior to this, my complaint was virtually overlooked by Managers not in my Category. I also reported acts of discrimination perpetrated against me. My complaint of discrimination is still to no avail. Thereafter, on ratings and performance snapshots my Managers of a different Category consistently rated me undeservingly lower than those co-workers not in my Category. On July 21, 2021, I was not offered a position as a Manager in my career ladder progression whereas, my co-workers of a different Category were. On April 19, 2021, due to the stress of this treatment it became necessary for me to take a medical leave of absence.**

**I was informed I needed improvement regarding my Soft Skills capabilities.**

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| **Digitally signed by Maria V Barlow on 01-05-2022 10:13 AM EST** | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA ☒ EEOC | 410-2022-00525 |
| | | and EEOC |

*State or local Agency, if any*

**I believe I was discriminated against because of my race (African American) and in retaliation for opposing unlawful employment practices, in violation of Title VII of the Civil Rights Act of 1990, as amended.**

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| **Digitally signed by Maria V Barlow on 01-05-2022 10:13 AM EST** | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

CP Enclosure with EEOC Form 5 (11/09)

**PRIVACY ACT STATEMENT:** Under the Privacy Act of 1974, Pub. Law 93-579, authority to request personal data and its uses are:

**1.   FORM NUMBER/TITLE/DATE.** EEOC Form 5, Charge of Discrimination (11/09).

**2.   AUTHORITY.** 42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117, 42 U.S.C. 2000ff-6.

**3.   PRINCIPAL PURPOSES.** The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti-discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.

**4.   ROUTINE USES.** This form is used to provide facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws). Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination. This form may be presented to or disclosed to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions. A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.

**5.   WHETHER DISCLOSURE IS MANDATORY; EFFECT OF NOT GIVING INFORMATION.** Charges must be reduced to writing and should identify the charging and responding parties and the actions or policies complained of. Without a written charge, EEOC will ordinarily not act on the complaint. Charges under Title VII, the ADA or GINA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed. Charges may be clarified or amplified later by amendment. It is not mandatory that this form be used to make a charge.

### NOTICE OF RIGHT TO REQUEST SUBSTANTIAL WEIGHT REVIEW

Charges filed at a state or local Fair Employment Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA. Some charges filed at EEOC may also be first handled by a FEPA under worksharing agreements. You will be told which agency will handle your charge. When the FEPA is the first to handle the charge, it will notify you of its final resolution of the matter. Then, if you wish EEOC to give Substantial Weight Review to the FEPA's final findings, you must ask us in writing to do so within 15 days of your receipt of its findings. Otherwise, we will ordinarily adopt the FEPA's finding and close our file on the charge.

### NOTICE OF NON-RETALIATION REQUIREMENTS

Please **notify** EEOC or the state or local agency where you filed your charge **if retaliation is taken against you or others** who oppose discrimination or cooperate in any investigation or lawsuit concerning this charge. Under Section 704(a) of Title VII, Section 4(d) of the ADEA, Section 503(a) of the ADA and Section 207(f) of GINA, it is unlawful for an *employer* to discriminate against present or former employees or job applicants, for an *employment agency* to discriminate against anyone, or for a *union* to discriminate against its members or membership applicants, because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an

investigation, proceeding, or hearing under the laws. The Equal Pay Act has similar provisions and Section 503(b) of the ADA prohibits coercion, intimidation, threats or interference with anyone for exercising or enjoying, or aiding or encouraging others in their exercise or enjoyment of, rights under the Act.

# Exhibit B: Defendant's Position Statement

**Deloitte LLP**
1221 Avenue of the Americas
New York, NY 10020
USA
Tel:  +1 212 653 5637
www.deloitte.com
meberger@deloitte.com

## VIA EEOC RESPONDENT'S PORTAL

June 1, 2022

William M. Batts
U.S. Equal Employment Opportunity Commission
Atlanta District Office
100 Alabama Street, S.W, Suite 4R30
Atlanta, GA 30303

**Re:    Maria V. Barlow v. Deloitte Consulting LLP
EEOC Charge No.: 410-2022-00525**

Dear Mr. Batts:

Deloitte Consulting LLP ("Deloitte") submits this response,[1] upon information and belief,[2] to
the United States Equal Employment Opportunity Commission (the "EEOC") in connection
with the above-referenced Charge of Discrimination (the "Charge") filed by Maria V. Barlow.

**Introduction**

Ms. Barlow alleges that Deloitte has discriminated against her based on her race and sex and
retaliated against her, in violation of Title VII. (*See* Charge of Discrimination, attached hereto
as Exhibit A.)  Ms. Barlow's allegations are baseless, and also are not actionable given that her
Charge is untimely.  She has not alleged a single timely discrete act, and there is no arguable
"continuing" violation.

---

[1]      Deloitte Consulting LLP considers the business information in this document, and the other documents,
Electronically Stored Information ("ESI"), and data produced with it, confidential and exempt from production
under the Freedom of Information Act ("FOIA"). In particular, the documents, ESI, and data fall within the
applicable exemptions that protect information exempted from disclosure by statute as well as "trade secrets and
commercial or financial information" that is "privileged or confidential," and personnel information, the
disclosure of which would constitute an unwarranted invasion of personal privacy. Accordingly, Deloitte is
designating all of the documents, and/or any ESI, and data that are being produced as exempt from FOIA and
requests pre-disclosure notification of any request for this information and a corresponding opportunity to object
to production.

[2]      This response is made in good faith based upon Deloitte's understanding of the allegations and its
investigation to date. By submitting this response, Deloitte does not waive its right to present new, different, or
additional facts, defenses, or arguments based upon subsequently acquired information or evidence.

Member of
Deloitte Touche Tohmatsu Limited

*Background*

Ms. Barlow is currently employed as a Senior Consultant in Deloitte's Government & Public Services ("GPS") group, providing consulting services to government agencies. Deloitte accommodated her with a short-term disability ("STD") leave beginning April 16, 2021. She remains on leave.[3]

*Ms. Barlow's Track Record of Issues with Managing Others*

Prior to her leave, Ms. Barlow's work performance met expectations with respect to the deliverables she prepared for clients. However, Ms. Barlow received feedback that her management skills led to conflicts with her team members. A successful track record of managing others is crucial before being promoted to Manager. To that end, Ms. Barlow was afforded the opportunity to manage others on a team in "stretch" roles on several of her projects. Repeatedly, team leaders needed to intervene in her interactions with others, many of them devolving into personality conflicts and escalating to behavior that was not conducive to a productive work environment. Several employees brought concerns to team leaders about Ms. Barlow and at least one chose to roll off a project because of her. One employee brought a complaint concerning Ms. Barlow to Deloitte Talent Relations in 2019.

Ms. Barlow received feedback consistently since 2019 that she needed to improve her communications and teaming with others. In Ms. Barlow's discussions with Managers and Senior Managers, she acknowledged that she needed improvement in these areas. Ultimately, having failed to address these concerns about her management of others, it was determined that Ms. Barlow was not ready for promotion to Manager in 2021.

*There is No Evidence of Discrimination in Ms. Barlow's Performance Feedback*

Refuting any inference of discrimination, Ms. Barlow's performance feedback in many instances was provided by managers who fell into one or both of the same protected categories as Ms. Barlow.[4] Ms. Barlow's coach, Yolanda Williams, conducted due diligence about Ms.

---

[3]     Deloitte maintains several robust benefits programs, which are each designed to assist our professionals in managing their personal circumstances. These programs include, but are not limited to, Deloitte's generous Paid Time Off ("PTO"), Paid Family Leave ("PFL"), STD and long-term disability ("LTD") Programs. Deloitte's STD Program provides short-term income continuation for 25 weeks if, as a result of a disability, a professional is certified as unable to perform the normal job functions by a health care provider. Deloitte's vendor, MetLife, administers Deloitte's STD and LTD Programs. Once an employee exhausts the 25 weeks of STD benefits under the STD Program (in addition to a one-week waiting period), they may be eligible for LTD.

[4]     For ease of reference, please note the following demographic information for Ms. Barlow's coach and managers: Yolanda Williams, Coach/Manager (Black female); Natasha Kirkland, then Senior Manager, current Managing Director (Black female); Tyler Burbridge, former Manager (white male); Chris Long, Manager (white male); Melissa Manning, former Manager (white female); Jennifer Camp, former Manager, current Senior Manager (white female); Patrice Williams-Lindo, former Manager (Black female); Dionne Grey, former Manager (Black female); Kristina House, former Manager (Black female).

William M. Batts
U.S. Equal Employment Opportunity Commission
Atlanta District Office
Page 3

Barlow's performance, synthesizing the feedback about her performance from team leaders, including Natasha Kirkland and Chris Long.  Deloitte had legitimate business reasons for not recommending Ms. Barlow for promotion in 2021.  Simply because Ms. Barlow did not like or agree with her performance feedback, or the decision not to promote her, does not make it discriminatory or retaliatory.  A thorough review of the facts shows no indicia of discrimination or retaliation in Deloitte's decision-making.

*Ms. Barlow's Internal Complaint*

Ms. Barlow raised an ethics complaint via Deloitte's Integrity Helpline[5] on January 29, 2021. Ms. Barlow complained about the productivity of a former contractor, ▮▮▮▮▮▮▮▮▮▮, managers' approval of ▮▮▮▮▮▮▮ time which Ms. Barlow believed was falsified, and ▮▮ ▮▮▮▮ interactions with her and others on the team.  Ms. Barlow also alleged she was retaliated against for raising these issues with her manager.  During the course of their investigation, Talent Relations representatives conducted a number of interviews.  Ms. Barlow's allegations were not substantiated, and Ms. Barlow was informed of same.

Ms. Barlow raised additional concerns on or around August 8, 2021, alleging she was not given fair consideration for promotion to Manager because of her race and gender, and raising further communications and time charging issues.  Ms. Barlow also reported racial comments allegedly made by a Deloitte employee to a client, for which Ms. Barlow was not present.

In response and as it does in the usual course, Talent Relations conducted an investigation which involved interviewing several witnesses and reviewing documents.  Once again, Talent Relations was unable to substantiate any of Ms. Barlow's allegations.

*Ms. Barlow's Claims are Untimely*

As to the chronology of events, Ms. Barlow alleges that she was denied a promotion on or around July 21, 2021 due to her race and gender and in retaliation for her raising concerns. Though she has been on leave since April 2021, Ms. Barlow alleges that these violations are continuing through November 21, 2021.  (*See* Exhibit A.)  Any argument that these violations occurred, or that they did so within the alleged timeframes, is baseless.  Upon information and belief, Ms. Barlow had a discussion with her coach in January 2021 in which she learned that she would not be recommended for promotion based upon the feedback collected.  Ms. Barlow went out on leave on or around April 16, 2021.  The national communication announcing promotions on June 1, 2021 represents the outside date which Ms. Barlow can argue triggers the statute of limitations of 180 days surrounding her claim.  As such, in order to be timely, she was required to file a Charge by November 29, 2021.  The instant Charge was filed on

---

[5]     The Integrity Helpline is available for employees who prefer not to report through the managerial chain of command or other reporting options (including directly to Talent Relations or by calling 1-800-DELOITTE). Employees can also bring anonymous complaints through this method, though Ms. Barlow chose to identify herself.

January 5, 2022, rendering it untimely. (*See* Ex. A.)

Accordingly, both because her allegations do not support a claim of retaliation or discrimination, and because Ms. Barlow's claims are untimely, Deloitte respectfully requests that Ms. Barlow's Charge be dismissed in its entirety.

**Deloitte is an Equal Opportunity Employer**

Deloitte's policy is to recruit, employ, train, compensate, and promote without regard to any legally protected basis, including race and gender. (*See* Equal Employment Opportunity Policy, attached hereto as Exhibit B.) It also does not tolerate any harassment based on any legally protected basis. (*See* Anti-Harassment Policy, attached hereto as Exhibit C.) In addition, retaliation based on any employee activity related to the administration of equal employment opportunity laws, or an employee's opposition to any act or practice that is unlawful under such laws, is prohibited. (*See* Non-Retaliation Policy, attached hereto as Exhibit D.)

**Deloitte's Performance Management Process**

Deloitte has a robust performance management process designed to require feedback to be collected consistently throughout the year for various client engagements that professionals work on. The process encourages professionals to schedule frequent check-ins with managers and team leaders for the fruitful exchange of feedback in real time. Further, Deloitte's performance management process allows the employee to solicit multiple reviews on a quarterly basis, called "Snapshots," which document performance feedback from different sources at the current point in time using both standardized questions as well as soliciting comments from managers. A Snapshot is a single data point among many that is used to evaluate an employee's performance. With regard to the question aimed at whether the employee is operating at the next level, simply because a professional receives a "yes" response from an individual feedback provider does not necessarily mean they are guaranteed or should expect to be promoted—rather, it is a picture of whether they are operating at the next level on the project at issue at the time the feedback is collected.

**Ms. Barlow's Employment with Deloitte**

Ms. Barlow joined Deloitte as a Consultant in GPS on or around May 10, 2015. She was promoted to Senior Consultant on or around August 26, 2018. She is aligned to the Strategy and Transformation Talent group within Finance and Enterprise Performance ("F&EP") and is assigned to Deloitte's Atlanta office. Ms. Barlow worked on a variety of projects for government clients while she was actively working for Deloitte.

*Ms. Barlow's Performance*

Ms. Barlow was assigned to one project from December 2018-June 2019. While on this project, in or around May 2019, another employee complained to Deloitte Talent Relations about the way Ms. Barlow delivered feedback, stating that the way she did so inappropriately included personal examples, specifically mentioning the employee's recent engagement, which made the employee uncomfortable. Ms. Barlow was then coached on how to properly deliver performance feedback.

Nonetheless, Ms. Barlow's performance issues in this area persisted, and Ms. Barlow continued to have difficulties delivering messages to her teams, including feedback and direction as to how to complete tasks. (*See* Exhibit E, Ms. Barlow's Performance Information.) Ms. Barlow acknowledged this was an area of development she discussed with Ms. Kirkland, specifically that she needed to create an environment where people feel they can present their ideas, to work better with her colleagues, and be flexible. She was staffed on another long-term project beginning in or around November 2019. Ms. Barlow worked with ▉▉▉▉▉▉▉ on this project. Conflicts between Ms. Barlow and ▉▉▉▉▉ affected other members of the team, requiring Ms. Barlow's managers, in alignment with Ms. Kirkland's directive, to step in to lead the team.

Ms. Barlow's managers heard from Ms. Barlow's team members that she was delivering feedback and direction in a manner that was demeaning and demoralizing. These conflicts occurred with team members of various races and genders.

A number of specific examples came to the attention of Ms. Barlow's managers. One colleague (Black male) chose to exit a project to cease working for Ms. Barlow, stating Ms. Barlow made him feel "demoralized." Another employee (Indian male) reported that Ms. Barlow made him feel inadequate and underperforming, was afraid of asking for help for fear of being reprimanded, and Ms. Barlow attempted to motivate him in a demoralizing manner.

Finally, a Consultant (Hispanic male) on Ms. Barlow's team complained to Mr. Burbridge and Ms. Kirkland that Ms. Barlow had made a dismissive comment to him when he had COVID in or around August 2020, telling him if he could not show up healthy and bring 100%, then not to show up at all. In addition, this team member complained to Ms. Kirkland and Mr. Long, who replaced Mr. Burbridge to manage the project, that Ms. Barlow was acting in a condescending manner when she became frustrated and was acting unprofessionally, requiring him to work extended hours. Because of Ms. Barlow's conduct with her team members and the feedback managers received about her, the team dynamics had broken down. On January 11, 2021, Ms. Barlow was told she would be rolled off the project, effective January 29, 2021.

Ms. Kirkland commented on Ms. Barlow's 2021 performance feedback: "Maria continues to have challenges leading people. Several team members have expressed challenges working with her." (*See* Exhibit E). Ms. Kirkland consistently indicated in 2021 that Ms. Barlow was not

"operating at the next level." (*See id.*) Indeed, Mr. Long was the only manager who indicated on a single Snapshot that Ms. Barlow was operating at the next level. [6] (*See id.*)

*The Decision Not to Promote Ms. Barlow*

In January 2021, Ms. Williams synthesized the feedback she received from Ms. Barlow's managers, and did not recommend Ms. Barlow for promotion in 2021 due to the ongoing teaming issues. (*See id.*) Around this time, Ms. Barlow had a discussion with Ms. Williams concerning her performance feedback and she was informed that she would not be recommended for promotion.

Following this conversation, Ms. Barlow's case was still presented to the promotion panel on or around March 12, 2021. However, Deloitte determined Ms. Barlow's promotion should be deferred until she improved in the management of others. Ms. Barlow went on leave and did not have any further discussion with her coach during the period when the promotion decisions are typically formally discussed with professionals. The national announcement regarding promotions was published on June 1, 2021.

**Ms. Barlow's Complaint and Subsequent Investigation**

On January 29, 2021, Ms. Barlow raised an ethics concern through Deloitte's Integrity Helpline. In her complaint, Ms. Barlow alleged that her project was under-resourced and she disagreed with staffing decisions made. She further alleged that there were ethical conflicts, insubordination, a hostile work environment, and verbal abuse. Her complaints were largely focused on a former contractor, ▨▨▨▨▨, whom she alleged was not completing her assigned work and that managers did not take appropriate action in response. She also raised a concern that she was being retaliated against for raising concerns about Ms. Stewart to Mr. Burbridge. She claimed that the issues that arose with Ms. Stewart prevented her from being promoted. **In this initial complaint, she did not raise any concerns about race or gender discrimination.**

Deloitte's Talent Relations team interviewed Ms. Barlow extensively about her concerns. Following these interviews, Talent Relations undertook a thorough investigation into the allegations, interviewing ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨, and several of Ms. Barlow's other colleagues on the project. Talent Relations could not substantiate the concerns about unethical time charging, and found no evidence of a hostile work environment, or that any retaliation occurred.

---

[6]    In December 2021, ▨▨▨▨ completed a Snapshot connected with Ms. Barlow's work on her engagement with him. He noted that for purposes of the project, Ms. Barlow was operating at the next level. In January 2021 after becoming aware of the issues above, ▨▨▨▨ completed a second Snapshot related to Ms. Barlow's performance on the engagement, and in that instance indicated that she was not operating at the next level.

As part of its investigation, in March 2021, Talent Relations conducted a full review of Ms. Barlow's performance year and validated that she needed to show improvement around communications with others, as multiple team members had relayed concerns about her communications with them.  In addition, a client expressed concerns about Ms. Barlow's flippant response to a request, complaining to Ms. Kirkland that she was rude and lacked client engagement skills.  Based upon this feedback, it was clear Ms. Barlow would have difficulty leading a team and needed to show consistent readiness before she could be promoted to Manager.

Regarding her claim of retaliation by Mr. Burbridge for revealing her concerns about ███, it is simply not the case that her Snapshot went down after she raised the concerns— in fact, she received only one Snapshot from Mr. Burbridge, in June 2020, rating her the same as Ms. Kirkland at that time, and two Snapshots from his successor Mr. Long, who rated her higher than both Mr. Burbridge and Ms. Kirkland.  (*See* Exhibit E).

*Ms. Barlow Relays Additional Concerns Which Are Investigated*

Ms. Barlow then submitted additional information to Talent Relations on or around August 8, 2021, this time reporting that she was evaluated unfairly because she is a Black woman.  These concerns were also reviewed by Talent Relations.[7]  In particular, Ms. Barlow raised that white managers Mr. Burbridge and Melissa Manning (both no longer at Deloitte) did not fairly evaluate her.  The feedback does not reflect any unfairness whatsoever.  In addition to the feedback above from Mr. Burbridge, in March 2019, Ms. Manning rated Ms. Barlow neutral/neutral, while Kristina House, who falls into the same protected categories as Ms. Barlow, also rated Ms. Barlow neutral/neutral in October 2018.  (*See* Exhibit E.)

Ms. Barlow also alleged that a client representative reported to her that a Deloitte employee made derogatory comments about Black people during a meal with the client, allegedly using the phrase "Black bitches."  (According to Ms. Barlow he was not referring to Ms. Barlow, Ms. Barlow was not present, and it is unclear he was referring to anyone at Deloitte.)  Ms. Barlow alleges that she reported this comment and that the employee was never reprimanded.  While he does not recall anyone using the phrase above, Yalew Meherka (Black male, Senior Manager) learned that a Deloitte employee made a comment that made the client feel uncomfortable.  The employee was coached, and Mr. Meherka addressed the issue with the client.  Ms. Barlow was not on a project at the time with this employee.  The subject employee left Deloitte of his own accord and is now working at the federal agency that also employs the client representative.

___

[7]        Ms. Barlow also raised a concern that managers on the engagement with her approved fraudulent work hours for white team members, specifically ███████████.  Talent Relations conducted interviews concerning ███████ time charging and reviewed time sheets of Deloitte employees on the team, and Ms. Barlow's allegations could not be substantiated.

**Ms. Barlow's Claims are Time Barred**

Ms. Barlow claims that she was denied a promotion on or around July 21, 2021.   The provenance of this date is unclear and has no apparent basis in fact.   A failure to promote claim accrues on the date that the employee becomes aware she will not be promoted.   *See, e.g., Hanani v. State of N.J. Dep't. of Environmental* Protection, 205 Fed. App'x. 71, 76 (3d Cir. 2006).   In this case, that date was no later than June 1, 2021.   Given the 180-day time limitation in which to file a claim, Ms. Barlow should have filed her Charge on or before November 29, 2021.   Ms. Barlow filed her Charge of Discrimination on January 5, 2022, rendering it untimely. (*See* Exhibit A).

To the extent Ms. Barlow alleges a continuing violation through November 21, 2021, this argument is without merit. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 (2002).   She has not alleged one timely act to which to tie her continuing violation theory, nor can a continuing violation argument be premised on a discrete act, let alone an untimely one. Ms. Barlow has been on leave since April 2021, so she cannot argue she has suffered any alleged adverse employment actions beyond the date she went on leave.   As such, her claims are baseless.

**The Claims Relating to Promotion Lack Legal Merit**

Even assuming Ms. Barlow's claims are not time barred, her claims lack merit.  Ms. Barlow was not promoted because she lacked crucial management skills.  Simply because Ms. Barlow believes she should have been promoted has no bearing on whether Deloitte's determination that she was not ready for promotion in 2021 was correct.  Ms. Barlow cannot proffer any evidence that her failure to be promoted was due to any discriminatory animus. *See Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010) ("The inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head.").

Indeed, negating any inference of discrimination, at that time, Ms. Barlow's salary was at the top of her applicable salary range/band for Senior Consultants in F&EP aligned to the Atlanta office.   She and another Black female Senior Consultant were earning the most among their similarly situated peers.

Accordingly, even if Ms. Barlow's allegations were timely (which they are not), her allegations regarding her promotion remain meritless.

**Ms. Barlow's Retaliation Claims are Without Merit**

Like her discrimination claims, Ms. Barlow's retaliation claims are untimely.  Any other theory of retaliation stemming from protected activity and/or an alleged adverse action prior to the

decision not to promote her is also untimely. Ms. Barlow has been on disability leave since April 2021, negating her ability to allege that any retaliation may have occurred since then.

Even assuming Ms. Barlow's retaliation claims are timely, the underlying factual allegations do not support a claim of retaliation. For the reasons stated above, Deloitte's Talent Relations team was unable to substantiate allegations of retaliation. While she may disagree with the significant impact the performance feedback has on her potential promotion, she cannot point to any change in course after she brought concerns to her managers or Talent Relations about issues on her projects, as Ms. Barlow was not marked as operating at the next level since 2019. Refuting any appearance of retaliation, Mr. Burbridge rated Ms. Barlow the same or higher than Ms. Kirkland did in Snapshots collected for the 2021 Performance Year. (*See* Exhibit E.) The fact that Mr. Long was the only manager to mark her as operating at the next level in more than two years is telling that he did not retaliate against her for raising concerns of any kind.

**Conclusion**

For the reasons set forth above, Deloitte respectfully requests that the EEOC dismiss the Charge in its entirety with a finding of no reasonable cause.

Respectfully Submitted,


*/s/ Meredith-Anne Berger*

_____

Meredith-Anne Berger
Counsel
Deloitte

Exhibit C: Response to Deloitte Consulting LLC. in the matter of Maria Barlow's EEOC Charge #410-2022-00525

Response to Deloitte Consulting LLC. in the matter of Maria Barlow's
EEOC Charge #410-2022-00525

**VIA EEOC CHARGING PARTY'S PORTAL**

September 29th, 2022

William M. Batts
U.S. Equal Employment Opportunity Commission
Atlanta District Office
100 Alabama Street, S. W. Suite 4R30
Atlanta, GA  30303

Re:  Maria V. Barlow v. Deloitte Consulting LLP
      EEOC Charge #410-2022-00525

## Charging Party's Response to Deloitte Consulting LLP

Dear Mr. Batts:

Maria V. Barlow submits this response to Deloitte Consulting LLP's (hereinafter Employer or Respondent) Response to the Charge of Discrimination, upon information and belief, to the United States Equal Employment Opportunity Commission (the "EEOC") in connection with the above-referenced Charge of Discrimination.

# Introduction

Maria V. Barlow alleges that Deloitte has discriminated against her based on her race and sex and retaliated against her, in violation of Title VII (Charge of Discrimination is attached hereto as Exhibit A).  The complaint is timely and cites discrete acts and continuing violation.

## Ms. Barlow's Complaints are Timely and Valid

The Respondent alleges that the Complainant should have been aware that the national notification of promotion decisions was released on June 1, 2021, and the 180-day rule to file a charge would have been by **November 29th 2021**. The respondent should be aware and account to the fact the complainant still conducted her filing of Charge in a timely manner by acknowledging the following:

1. The Complainant was never directly notified by any member of Deloitte of her status of promotion on or after June 1, 2021
2. Deloitte was notified of Ms. Barlow's discrimination complaint on August 8, 2021, **which is before November 29, 2021**. Deloitte did not respond to Ms. Barlow ultimately until responding to this current EEOC charge dated June 1, 2022
3. Ms. Barlow's current charge was initiated on October 25, 2021, as indicated in the EEOC file, **which is before November 29, 2021**
4. With the backlog and systematic processing of claims the EEOC was able to hear the Charge in Mediation in December of 2021
5. The current charge was signed on January 5, 2022

The Charging Party made her concerns and charge of a pattern of long-term discrimination clear in August 2021 to Deloitte and again with the EEOC in October 2021, these two (2) instances represent good faith and effort to submit her Charge in a timely manner. The date of record that should start the 180-day rule should be the date that the Respondent was made aware of the promotion decision, which is when that information is green- lighted for the entire population through system changes which was when Ms. Barlow looked for the information on or around **July 21, 2021**. 180 days from that date is **January 17th, 2021, and the Charging Party signed the official charge January 5, 2021**, still within the 180 -day time frame. The Respondent's claim that the discriminatory acts are time barred are invalid.

## Discrimination of a Protected Class by the same Protected Class can still be illegal discrimination

On page 7 of the Respondents' Position Statement, they assert that because Ms. Kirkland (black female), and another manager Ms. House ((404) 432-3712) (black female) both fall into the same protected categories as Ms. Barlow (black female), their ratings of Ms. Barlow and conduct towards her could not possibly be discriminatory. This premise is false. The EEOC website under race and color frequently asked questions states:

### Is it illegal to discriminate against or harass someone of your own race?

Yes. It is illegal for people to discriminate against people of their own racial group on the basis of race or color. For example, a light-skinned Black male may not harass another Black male who has darker skin.

(https://www.eeoc.gov/youth/racecolor-discrimination-faqs)

Throughout this response to the Employer's Position Statement, it will demonstrate how Ms. Kirkland did not allow for promotional opportunities for Ms. Barlow by her actions on client projects. In fact, Ms. Kirkland stereotyped Ms. Barlow as an angry or problematic personality having black woman which is the furthest from Ms. Barlow's intentions and actual actions.

## Background

Ms. Barlow is currently employed as a Senior Consultant in Deloitte's Government & Public Services ("GPS") group, providing consulting services to government agencies. Deloitte accommodated her with a short-term disability ("STD") leave beginning April 16, 2021. She returned to work from Long Term Disability Leave on June 13, 2022. Ms. Barlow experienced a medical condition due to the Respondent's actions and was forced to take leave. She is currently working half-time with work accommodations and has had to self-navigate to a position away from the previous CDC Account structure which included her former Senior Managers Natasha Kirkland (black female) and Yalew Meherka (black male) as well as, from her former coach Yolanda Williams (black female). She currently does not have a confirmed opportunity for her to seek promotion to manager in the current performance year because of adjustments needed to not engage with parties in this charge.

## Employer's Claim Regarding Ms. Barlow's Alleged Track Record of Issues with Managing Others

The employer response indicates that Ms. Barlow did meet expectations when it came to her work deliverables and alleges that Ms. Barlow has a track record since 2019 of communications and teaming issues.  Natasha Kirkland directly managed Ms. Barlow day-to-day on projects from 2019-2021. Rather than constructive feedback, lending of resources, e.g., executive coaching, team working sessions by senior management, etc. other white male leads were conveniently inserted; however, the same below-level performance and negative behaviors of non-performance of team members persisted.

The employer fails to mention that from 2019-2021, they consistently increased the size of the persons Ms. Barlow directly managed from 6 to 26 employees through client work and firm initiatives. Ms. Barlow led 12 FTEs in the CDC CREW DEI and Talent Experience Pillar, which include Apprenticeship & Development, Staffing, Diversity, Equity, and Inclusion work streams, as well as, spearheading the Enterprise Performance Solutions Fair with a team of 12. Ms. Barlow received numerous Deloitte "Applause Awards" in 2015, 2017, 2018, 2021 with a "Thank You Award" in 2021.

The employer also fails to mention that along with the garnering of more responsibilities and managed persons, Ms. Barlow received anonymous feedback from 9 people that she supervised, coached, and worked with in 2021(the year of promotion denial) in her "Loop Report" [Exhibit B: Maria Barlow's 2021 Loop Report Feedback]

They responded with verbatim feedback below:

What leadership behavior does this person regularly exhibit?

- Maria has been a tremendous mentor and guide for me. In many instances she has provided me with opportunities for leadership roles and business development activities. Through working with her I have been able to learn and model my own habits after her best practices, including her team building and management skills.
- You do a great job balancing direction and autonomy. I also appreciate that you take time to catch up with people during virtual meetings versus launching directly into business.
- Ms. Barlow is fun to work with, even on challenging tasks She embodies the spirit of inclusive leadership and gets excited about ideas coming from junior staff.
- Organized and works hard.
- Ms. Barlow communicates clearly and is receptive and open to ideas of the team.
- Builds meaningful relationships with others, communicates clearly.

## Employer's Claim That There is No Evidence of Discrimination in Ms. Barlow's Performance Feedback

As noted on page 4 of the Respondents' Position Statement "Deloitte's Performance Management Process" allows the employee to solicit multiple reviews on a quarterly basis, called "Snapshots." Snapshot collections details and comments are shared *with the practitioner's **coach** only*. It is with Snapshot information coaches are supposed to garner further details from the manager in the due diligence period (Phase 2 below)

Deloitte Performance Management Process Phases

| Phase:1: | Phase 2: | Phase 3: | Phase 4: | Phase 5: | Phase 6: |
|---|---|---|---|---|---|
| Snapshot collections are over the course of the performance year and are shared 2 times a year with coaches; midyear and end of year. The information is relayed to the practitioner. | "Due Diligence" conversations with Senior Manager and Manager on performance | "Consensus Panel" Persons who are moving to the next level, or having significant difficulties are discussed with the business offering and this open panel allows for objections from managerial constituents | Consensus panel meets after presentation to deliberate promotion decisions and compensation which is determined by the business offering | Information is given to coaches to give qualitative feedback for next year's development | Promotion decisions are greenlighted to be shared along with compensation statements along with bonuses and new salary decisions |

On page 6 of the Respondents' Position Statement the Respondent states "Ms. Williams did not recommend Ms. Barlow in 2021 due to the ongoing teaming issues." During the latter part of 2021 Coach Williams discovered inconsistencies in Ms. Kirkland and Mr. Burbridge "Snapshot" ratings (Phase 1) and the feedback on the work performed and operating level Ms. Barlow was self-reporting from her project work. Ms. Barlow was not privy to (does not have and was not given) the information from her snapshots. **In response to this, Ms. Williams told Ms. Barlow to schedule and have meetings with managers Long, Kirkland, and Meherka because she saw this pattern**

**before with Ms. Kirkland not providing transparent nor adequate support and coaching to other black women she mentored and supervised in previous years, more specifically Kristina House.**

Ms. Williams was told by Ms. Kirkland that she supported Ms. Barlow's promotion (11/25/2021 and to Ms. Barlow on 1/5/2021), and in a separate meeting with Chris Long (11/19/2021) (white male) verbally confirming that the core of the problems of the team did not originate from Ms. Barlow, yet problematic behavior from Reagan and the difficult client environment throughout the performance year; but, both confirmed support for promotion.

However, due to Ms. Kirkland's decision to roll Ms. Barlow off the project. Ms. Williams could not argue at consensus (Phase 3) that Ms. Barlow was in fact ready for promotion, if she

   1) lost client/project opportunity to support her to bill as manager (based on client relationship and years of experience)

   2) had support from her client project leadership through snapshots.

Ms. Williams did not know what further they wanted Ms. Barlow to do, as she performed every request of her leadership and supported her, knowingly she was operating at the next level. However, Ms. Kirkland stood by unsubstantiated claims of issues.

In addition, without Ms. Kirkland's sign off, Ms. Williams did not understand if she could fully recommend Ms. Barlow at consensus without objection (a call from the floor to dispute). Further, Ms. Williams did not want to put the observation out at consensus with business leaders in a political manner, that she saw this track record of Ms. Kirkland not being transparent or giving fair actionable feedback and review of performance for the advancement of black women.

Ms. Williams was directed by Talent sometime in February 2021, after the internal investigation had commenced, to present Ms. Barlow's story to the consensus panel in March. Ms. Williams stated that she would state the information she had, she did not indicate she was not recommending Ms. Barlow for promotion. Ms. Williams never communicated any promotion decisions to Ms. Barlow.

## Ms. Barlow's Internal Complaint

On page 6 of the Respondent's response, it asserts that Ms. Barlow's ethics complaint via Deloitte's Integrity Helpline on January 29, 2021, was about her complaining about the productivity and environment caused by a white female former contractor, her managers' approval of time in which both Ms. Barlow and her colleague Mr. Whipple ((706) 464-5679) were assigned to delegate task to her. Ms. Barlow continues to believe it was falsified from interactions with her and others on the team. Work products were not produced on multiple occasions, and Reagan refused to come to meetings without a personal ask from teammates she preferred, which did not include Ms. Barlow. Deloitte severed ties with subcontractor Reagan Stewart (white female) and was reported to Maria on 3/31/2021 as the results of the investigation conducted by Wendy Steiner (white female). Ties

with Ms. Stewart were not cut until after the complaint was lodged, and after many escalations to leadership of the non-productivity and behavior of the Contractor.

## Employers Claim that Ms. Barlow's Claims are Untimely

Ms. Barlow communicated her retaliation and discrimination issues to the Respondent in August 2021; she had not received any communications on her investigations with Deloitte and followed up by timely initiating her EEOC charge October 25, 2021; and timely filed her EEOC charge in January 2022. Please refer to section "Ms. Barlow's Complaints are Timely and Valid "above for full response on page 1.

# Deloitte is an Equal Opportunity Employer

This section is in response to "Deloitte is an Equal Opportunity Employer" section on page 4. Complainant has no response to the policies presented.

# Deloitte's Performance Management Process

Though the Respondent asserts that a "yes" response from an individual feedback provider does not necessarily mean they are guaranteed or should expect to be promoted-rather, it is a picture of whether they are operating at the next level on the project at the time the feedback is collected.

However, a reasonable professional would respectfully trust that if a person was rated "yes" as operating at the next level and did not resort to any intentional or egregious act or decline in work product, they would not change their opinion from "yes" to "no". However, Mr. Long, after the unsubstantiated claim and asking Ms. Barlow to roll off the project without clear explanation, he then rated her as "no" to performing at the next level; a factor considered in Ms. Williams analysis which was presented at "consensus". The employer does not mention the firm initiative snapshots that also may indicate Ms. Barlow was operating at the next level which was verbally indicated by Yalew Meherka as he oversaw Ms. Barlow manage a team of 12 that same performance year.

# Ms. Barlow's Employment with Deloitte

This section is in response to "Ms. Barlow's Employment with Deloitte" section on page 4. Complainant agrees with the information presented in this section; however, notes that she has primarily supported CDC projects for the majority of her time working for Deloitte.

## Ms. Barlow's Performance

Please see page 3 of this document, "Response to Respondent's Track Record of Issues with Managing Others" for the complainant's response to the Respondent's (page 5) "Ms. Barlow's Performance".

## The Decision Not to Promote Ms. Barlow

The respondent states on page 6 of their response that "Ms. Barlow's promotion was deferred by "Deloitte" until she improved the management of others". Thus, one can infer that there were no other needs to be met outside of improvement in management of others. As well as the respondent never mentions any other issue with Ms. Barlow's management of others outside the purview of Ms. Kirkland. Ms. Kirkland's purview was based on alleged communications presented to her by Talent and/or team members without evidence of communications being unprofessional or otherwise inappropriate.

*Requirements For Promotion*

| Network Buy-In | Proof Of Operating at Next Level | Service Offering Value Proposition | Ability to Bill Client at Next Level |
|---|---|---|---|
| "Performance Snapshots" and "Due Diligence" information collected by a practitioner's coach | Work shows proof of ability to manage more complex deliverables, grow client relationships, and create impact on greater scale | Specific area of value and ability to sell and provide solutions to clients | Unique client project environment in which engagement has capacity for practitioner to bill at promoted rates |

Ms. Barlow's performance exceeded expectations in areas in relation to her *service offering value* and *proof of operating at the next level*. This is corroborated by the respondent, as they say nothing was wrong with Ms. Barlow's work product, and the fact that she increased her management of persons greatly. **Network buy-in** and the **ability to bill client at the next level** were both accomplished as Ms. Barlow's project management leadership in the client space (Long and Kirkland) and firm initiative (Meherka) space gave their verbal confirmation of support in November and December of 2021. Ms. Williams' discussions alongside Ms. Barlow with managers Long and Kirkland gave no warning nor indication that Ms. Barlow would be removed from the client project. Ms. Barlow met promotion requirements outlined in the above table before the incident described below.

*Unsubstantiated Incident for Project Removal*

Ms. Kirkland confirmed Ms. Barlow's transition to greater responsibility on January 5th, 2021, in their touch base call and said that Mr. Long would no longer take responsibility for Luis Queremel's (latino male) snapshots. However, during that same week in a meeting with Luis, Reagan (white female),

and Ms. Barlow, Luis continued to display resistant behavior towards Ms. Barlow when discussing ideas on how to approach a client problem. Luis suggested doing items one way, and Ms. Barlow suggested another. Ms. Barlow asked Luis to further help her understand Luis's recommendation better by showing an example to the entire team later that day. Luis exclaimed "You're not listening to me" "You just talk over me". Ms. Barlow tried to explain that she sometimes cannot understand some concepts virtually and explained that Reagan took the opportunity last week as well to draw the idea out more and present it to the team so we could all be on the same page. Luis immediately contacted Ms. Kirkland, and Ms. Kirkland reached out to Maria and asked her what transpired.

Ms. Barlow was told she would be removed from the team on January 11th, 2021. At this discussion with Mr. Long and Ms. Kirkland, Ms. Barlow not only heard feedback that she never was told or coached on before such as "Your team members say you don't help them with their task when they're on PTO", "They say you don't listen to them". However, Mr. Long and Ms. Kirkland stated at the onset of the meeting that they stood by their positive feedback. When Ms. Barlow inquired what was the correct way to respond in that meeting, Mr. Long and Ms. Kirkland seemed perplexed at the substantiation that they received from Luis and Reagan. The team indicated that Ms. Barlow wasn't listening, or she was talking over them, when she asked to better understand the concept presented by Luis later that day. Ms. Kirkland questioned Mr. Long on the data they collected "yeah that part, that didn't make sense" and "I don't know", but the decision is final as they said they will roll off the project if you don't. Mr. Long and Ms. Kirkland's decisions impacted Ms. Barlow by restricting her from two (2) areas needed for promotion: *"Network Buy-in and the Ability to Bill Client at the Next Level"*. Ms. Barlow was not assisted or supported by Mr. Long, nor Ms. Kirkland to find another project opportunity that would support her promotion goals which were the focus of the entire performance year, and the capstone of a routine 3 years at the level.

Throughout the respondents' response, the Employer does not bring a single interaction where Ms. Barlow stated something disrespectful to a team member, put undue stress on a team member to produce, did something with ill intent to a team member, or stopped producing on making progress in her behavior or work product. Ms. Barlow is never deemed unwilling or intolerable with cause, nor written up for insubordination to directives from her managers.

### Legitimate Business Reason

The respondent also states that Ms. Barlow's removal from the project were for legitimate business reasons but does not list those reasons. This is critical to understand, if in fact there was a legitimate business reason, one was not set forth. From all indications, the reasons for taking Ms. Barlow off the project were unsubstantiated.

# Ms. Barlow's Complaint and Subsequent Investigation

Ms. Barlow submitted an ethics complaint to the "Deloitte Integrity Hotline" on January 29, 2021. The Helpline complaint was submitted after the same concerns were stated to leadership to no avail for over 9 months. The complaint was submitted subsequently to Ms. Barlow being told she was being taken off the project and 2 follow-up discussions. One where Ms. Barlow discussed her ethical

dilemma with Ms. Williams, her coach, and decided on listing her complaint formally. The other with Ms. Kirkland, Ms. Williams and Ms. Barlow, where Ms. Kirkland was notified, that Ms. Barlow would be submitting a hotline complaint.  Ms. Barlow notified Ms. Kirkland in that meeting that she felt ignored, unsupported and **treated very differently than her team members and white male colleagues.** This is where Ms. Barlow first brought up race and gender being a factor. Furthermore, in the weeks subsequent to Ms. Barlow's roll off, Ms. Kirkland did not lend any support and/or action for realignment of opportunity for development and/or need for consideration for promotion.  Ms. Kirkland was well aware that not being on a project rendered Ms. Barlow without the necessary requirements for promotion (see page 7),

The Respondent states that Ms. Barlow raised concerns that the project was under-resourced, and she disagreed with staffing decisions made. Ms. Barlow had worked on other projects and this project for some time and understood "staffing decisions" and the role/responsibility/authority of such was not hers; thus, had no reason to complain of such, and did not do so in her hotline complaint. The hotline complaint did raise the issues of unethical practices of charging for services and payment for services which were not performed by the Subcontractor assigned to this project, the behavior of the Subcontractor which included insubordination, creating a hostile work environment and verbal abuse, and the failure of management to respond to the complaints of the environment.

Ms. Barlow did indicate to Wendy Steiner, Deloitte Internal Complaint Investigator that it was her belief that her snapshots and the project roll-off decision were negatively impacted by project leadership in retaliation for her raising concerns of a non-working team member, Reagan Stewart, and issue if that Subcontractor was being paid for work not performed when actually supervised/ or given direction for Ms. Barlow's workstream. The Internal Complaint Investigator informed, via telephone, to Ms. Barlow that Deloitte severed relations with subcontractor Reagan Stewart after the hotline Complaint was submitted. The Subcontractor's lack of work and behaviors have and can be corroborated by others that worked on the team -such as Mr. Hebbale and Mr. Whipple who were present day-to-day.

The Respondent refers to Talent Relations' March 2021 "Consensus" Panel Review of Ms. Barlow's performance year (Phase 3 of the Performance Management Process); and, further that it was validated she needed to show improvement around communications with others, due to multiple team members had relayed concerns about her communications with them.  The concerns relayed were never directly communicated to Ms. Barlow-nor, any evidence that what was communicated by Ms. Barlow to what was unprofessional or otherwise inappropriate. Ms. Barlow is unaware of any evidence of unprofessional or otherwise inappropriate communication. As to the client who expressed concerns about a flippant response to a request. Ms. Kirkland was well aware that Reagan Stewart had failed to help prepare the Deloitte team with quality prototypes for the meeting. When being given feedback for the prototype from said client, Ms. Barlow, who was the facilitator for the 2-hr session, responded in the affirmative to the request with "of course".

Ms. Barlow did raise the concern of retaliation by team leadership, Natasha and Tyler, in snapshots after they were aware of the Subcontractor's low work performance and its systemic impacts on the team. Mr. Burbridge's and Ms. Kirkland's "Snapshots" did cause a negative mid-year review to be flagged. Ms. Barlow continues to allege that the ineffective management by leadership and the non-

performance of team members. As well as, when concerns were raised, rather than resolve issues or lend coaching resources, retaliation in downgrading Snapshots are the outcome.

Ms. Barlow has no visibility to the Snapshots, only scattergrams which reflect a data point (dot) in comparison with peers which visually showed that her Snapshots were lower than her peers. The ratings referred to in the Respondent's Response reflect those of ineffective leadership and coaching, namely Tyler Burbridge, Natasha Kirkland. Chris Long, according to the Respondent, rated Ms. Barlow higher than Burbridge or Kirkland prior to January 2021; then in January 2021 due to 'becoming aware of the issues', rated her as not operating at the next level. This incident is discussed on page "Unsubstantiated Incident For Project Roll Off". Mr. Long rated Ms. Barlow was performing at the next level and was well aware of 'the issues' stemming from Reagan Stewart. However, after asking Ms. Barlow to roll off the project, he rated Ms. Barlow was not operating at the next level, as she was asked not to be in the position of team lead of the project work. She clearly was demonstrating that she could lead the team when Mr. Long indicated that she was operating at the next level before the unsubstantiated incident.

## Ms. Barlow Relays Additional Concerns Which Are Investigated

Ms. Barlow initiated short term disability on April 19, 2021. When she was able to get a handle of the needs of her disability she wrote to her employer on August 8, 2021, further detailing her discrepancy in treatment on the CDC account through various projects from 2018 to 2021. She informed her employer that she wanted to return to work but was unsure of how and if they would listen to her concerns because they had not before. [Exhibit C: Charging Party Follow-Up Letter to Employer of August 8, 2021]

As noted on page 7 of the Respondent's Position Statement there is an inference that discrimination of a protected class by the same protected class cannot still be illegal discrimination, please see Complainants response "Discrimination of a Protected Class by the same Protected Class can still be illegal discrimination" on page 2 of this response.

# Continuing Discrete Violation Acts

The employer mentions several employees and their disposition of Ms. Barlow's behavior and how it made them feel. As we bring more light to each of these employees, the pattern of resolution is important to take note of is below:

a.  Ms. Barlow mentions low productivity or quality issues with deliverables or behaviors to a subordinate

b.  The subordinate raises complaints to Senior Manager Kirkland or Talent and with notion that Ms. Barlow has teaming issues

c.  Ms. Kirkland nor Talent notifies Ms. Barlow of the issue by questioning Ms. Barlow as to "why the person may be mad" or what the issue may be. Ms. Barlow states the interaction

and Ms. Barlow continues to offer support and produce work deliverables. Ms. Barlow never refuses to work, make suggestions, advise and readily tries to implement the direction management gives her.

d. Senior Manager Natasha Kirkland intervenes with adding another Manager, usually white, who succeeds duties that were assigned to Ms. Barlow. Management does not communicate or find resolve that works for everyone or allow an equal amount of support for garnering skills and opportunities for attrition for everyone. Intervention manager observes evidence of Ms. Barlow's observations.

e.   Ms. Barlow is impacted by losing workstream support, hindered by working through others (primarily white males), chastation from superiors, and the ability to be an effective leader by being told to not say anything. Ms. Barlow is ultimately tainted with a purview that she requires others to intervene when teammates refuse to take direction from Ms. Barlow. This further impacts her promotion probability.

## Taylor

The Respondent's Position Statement refers to a 2019 complaint to Talent referring to a hostile work environment and infers that the complainant stated that Ms. Barlow's use of her personal life offended her. Below is a brief recount from Ms. Barlow:

**Situation:** Taylor (white female) was aggressively questioning manager Patrice Lindo (black female) in a team meeting after Ms. Lindo gave Taylor developmental feedback on prepping for a client meeting. Taylor was in disagreement with Ms. Lindo's feedback. Ms. Barlow takes Taylor to lunch after that uncomfortable team meeting to get on a better working relationship page.

**Ms. Barlow's Comment:** "Well you're engaged. You know when we don't see eye to eye with our partners that we sometimes brush things off and try to get along"

**Taylor's Response:** Complaint to Talent that Ms. Barlow's behavior was creating a hostile work environment for her and that she did not like critiques o

**Management Decision/Coaching Given:** Ms. Barlow was told by Ms. Kirkland during this project that she was ready for early promotion to Manager as she was training the 'new to the firm' Manager Ms. Lindo. After the Talent complaint, Ms. Barlow was met with a leadership response of not teaming satisfactorily; and, when asked for assistance/support on what to do-no action by leadership. Ms. Barlow was never contacted by Talent about this complaint, and Coach Yolanda Williams' feedback was that "Ms. Barlow needs to document when subordinates are not producing and report it to Talent before they start to criticize Ms. Barlow with unsubstantiated or loose claims with no ill intent". Adrian, a first-year analyst on the team who was coached alongside Taylor by Ms. Barlow, had no issues with the guidance or communications of Ms. Barlow according to the findings of Ms. Kirkland's investigation. Ms.

Kirkland requested only Ms. Lindo give Taylor assignments and she closely monitors interactions.

## Jayson Ross

As noted on page 5 of the Respondents' Position Statement there is an inference that a black male chose to exit a project to cease working for Ms. Barlow, stating Ms. Barlow made him feel "demoralized." The reference is to Jayson Ross.

**Situation:** Jayson's ill performance was noted to Ms. Barlow on day one of the project by Dionne Grey and Chris Long. Ms. Barlow had taken Jayson to lunch during the 1st week to try to get to know each other. Jayson was being led by Ms. Barlow and Mr. Whipple in a scheduled brainstorming session for the client's recommendations.

**Ms. Barlow's Comment:** "Are you taking notes on what we have on the whiteboard"

**Mr. Ross Comment:** "No I'm doing my expense report right now"

**Management Decision/Coaching Given:** Ms. Kirkland requested Ms. Barlow dial down any request for Jayson and to carbon copy her on any communications with Jayson. Ms. Kirkland's direction was that Jayson was to support Richard's workstream only. Richard continued to see the poor work product displayed by Jayson and often mentioned it to Ms. Barlow throughout her time at DHAP. Ms. Barlow was left to work alone on her workstream which had a larger scope and lift than Richard's workstream. No further coaching or direction was given to Ms. Barlow on Jayson.

## Reagan Stewart

Ms. Barlow's Integrity Hotline complaint included reference to Reagan Stewart (white female), a subcontracted UX designer that was hired to support the workstream led by Ms. Barlow.

**Situation:** Prepping for a client meeting and needed quality change edits (grammatical errors) in the prototypes 5/27/2020

**Maria's Email:** "Hey Reagan, these are the edits we need tackled before our call. Can you tackle these before our call? Let me know if you have questions"

**Reagan's Email Response:** "no"

**Management Decision/Coaching Given:** Email is forwarded to Tyler "Interesting… thanks for including me. Depending on how the conversation with Natasha goes tomorrow, I have some questions/thoughts around Reagan's expectation". Reagan continued to underperform

and being resistant to working with Ms. Barlow and caused more work required from the entire team.

---

**Situation #2:** Team members Chetan, Maria, and Reagan are in a working session to make edits.

**Ms. Barlow's Ask:** "Can you take a note of these two names for prototype changes"

**Ms. Stewart:** "No you can email it to me. You're going to learn today to write this down. I'm not writing anything"

**Management Decision/Coaching Given:** Reagan continued to underperform and was resistant to working with Ms. Barlow. Natasha does not coach Ms. Barlow on working with Reagan as she then directed for work to go through Tyler or Chris.

## Luis Queremel

As noted on page 5 of the Respondents' Position Statement there is an inference that Ms. Barlow made a dismissive comment to him when he had COVID in or around August 2020, telling him if he could not show up healthy and bring 100%, then not to show up at all.

**Situation #1:** Luis contracted COVID-19 and was already aggressively trying to demonstrate that he could operate at the next level. The firm's culture and policy allowed for free time off as well as support from team members to step in. Ms. Barlow was conscious of the illness, its sudden volatility, and asked him how he was feeling day-to-day of his illness. His illness caused at least one sick day (8/13/2020). The client meeting was 1 day out of a week-long illness. Luis was not leading or facilitating in the meeting and was tasked as a note taker.

**Ms. Barlow's Comment:** "Hey Luis, it's ok, we can definitely handle it if you're not if you're not feeling 100%"

**Mr. Queremel's Comment:** Complaint to Natasha that Ms. Barlow's behavior is problematic

**Management Decision/Coaching Given:** Ms. Barlow's first and only knowledge of such a concern from Luis was upon reading the Respondent's Position Statement.

---

**Situation #2:** Luis does not provide insight on his issue with working with Ms. Barlow and does not tell Ms. Barlow what he is offended by. He's resistant to client work requests, and any performance check-ins requested by Ms. Barlow.

**Mr. Queremel's Response:** Complaint to Natasha that Ms. Barlow's behavior is problematic

**Management Decision/Coaching Given:** Ms. Barlow is never told verbatim to this day, what she said that offended Luis as he is insubordinate to her request. Ms. Kirkland nor any other person in project leadership ever mentions words or phrases to Ms. Barlow that may be inappropriate.

[9/29/2020 11:07 AM]
Can we touch base at 1 very quickly on the scenarios and tables?

[9/29/2020 11:09 AM]
Also I'm only available for 30 of the working session. I have a conflict with NK at 2:30.

[9/29/2020 11:12 AM] Queremal Milani, Luis Eduardo:
I have a conflict at 1, but we can meet at 1:30

[9/29/2020 11:12 AM]
I have a conflict at 1:30
Is your 1pm client based?
Can it be rescheduled?

[9/29/2020 11:19 AM] Queremal Milani, Luis Eduardo:
I am sorry but it cannot be rescheduled. I would make an effort but based on the conversation that we have yesterday, and the tone that you used to address Reagan and myself, I will not go out of my way to reschedule my day for a meeting that I am not requesting nor expect to have after we touch base this morning. I need the time to make sure that the table and these instructions look right and not to be treated with the same approach as I was treated yesterday. This is a professional environment and we are professionals

[9/29/2020 11:21 AM]
Luis if you have a issue with tone or the way your addressed please make sure to bring it up in our touch points, or set aside time to discuss. I'm more than willing to assist and make changes if your uncomfortable and have offered to understand what specific situation or instances that your referring to when you have mentioned this before.

[9/29/2020 11:23 AM]
This is to regroup on client work and alignment as a team. Client work is a priority as always before firm initiatives. If you have hard and fast conflicts, or need to be OOO, please communicate those in the stand up so we can be aware as a team.

## Chetan Hebbale

As noted on page 5 of the Respondents' Position Statement there is an inference that Ms. Barlow made an Indian male feel inadequate and underperforming, was afraid of asking for help for fear of being reprimanded, and Ms. Barlow attempted to motivate him in a demoralizing manner.

**Situation:** Chetan was new to government financial management and talked openly about this to Ms. Barlow. Ms. Barlow noticed that in some sessions after meetings took place with Chetan that items would be missing on requirements or notes with missing information and readily offered to fill in the gaps. This varied from Chetan's usually stellar performance of capturing details during meetings.

**Ms. Barlow's Comments:** Mentions an observation to Chetan about the client request in the meeting the day before and Chetan does not respond. "Do you remember when the client stated these requirements changes the day before". Chetan doesn't say anything, and Ms. Barlow goes on with what needs to be included in the requirements documentation for accuracy.

**Mr. Hebbale's Response:**  Complaints to team leadership that Ms. Barlow made him feel like he was inadequate and underperforming, which was afraid of asking for help for fear of being reprimanded, and Ms. Barlow attempted to motivate him in a demoralizing manner.

**Management Decision/Coaching Given:** None. Ms. Barlow was never told about Mr. Hebbale's attitudes towards Ms. Barlow. DHAP leadership never told Ms. Barlow of these issues and Ms. Barlow is bewildered at this allegation.

**Important Details:** Chetan counselor confirmed the absent-mindedness being consistent with other feedback of Mr. Hebbale when providing mid-year feedback. Chetan admitted to the team sometime after that he was having sleep issues and anxiety as he was preparing for the GRE to attend a Master's program to which he is currently enrolled in at John Hopkins. He no longer works for Deloitte.

# Discrete Acts Continue to Happen Under The Leadership of Natasha Kirkland

Ms. Barlow's discrimination complaints are timely because they show a continuing distinct pattern of discriminatory practices from 2019-2021 under the senior management of Mrs. Natasha Kirkland. These acts revolve around the difference of treatment in:

1. addressing the raising of issues and concerns from team members,
2. difference in treatment of working responsibilities,
3. and differences in support of effective coaching and resolutions.

Numerous single timely discrete acts and the continuation of such acts have been set forth.

## Differences in Natasha Kirkland addressing the raising of issues and concerns from Ms. Barlow vs. other team members

The Employer indicates that several employees brought concerns about Ms. Barlow and at least one chose to roll off a project because of her.  However, the concerns of Ms. Barlow about team members [who she was assigned to lead] not meeting expectations is never mentioned by the Employer.  Further the Employer makes no reference to any support of leadership for corrective action/resolution - not even when Ms. Barlow directly asked for guidance.

When asked about conflict, Ms. Barlow asked for guidance for resolution, and received from managers, Natasha Kirkland, Tyler Burbridge, and Chris Long the responses of : "don't talk about project work", try to get to know people personally, let Chris or Tyler give the assignments; suggesting Chetan  or Luis can find a better stride with getting Reagan to come to work meetings and fulfilling her responsibilities as the UX Designer. These directives did not empower Ms. Barlow and she was constructively stripped of authority as a team leader. It empowered the persons not

doing the work, as they were often shielded and not admonished for not showing up to team meetings, producing work, nor supporting the team.

Ms. Barlow first brought up Reagan's work performance in April 2020 and her escalations to the team managers fell on death ears until Ms. Barlow escalated the claim to Talent through the Integrity Hotline in January 2021. Ms. Barlow wrote and forwarded emails, scheduled calls and consistently warned her immediate management of the impacts of the non-working team members' behavior on the entire team (Chetan, Luis, Richard) and herself. Reagan's behavior stopped multiple team meetings and there was no dismissal of her, nor major consequences for her actions. Ms. Kirkland eventually allowed Luis and Reagan's desire of not willing to work with Ms. Barlow was the primary reason she dismissed Ms. Barlow from the project in January 2021.

## Differences in Working Responsibilities from Ms. Kirkland

The employer alleges that "Repeatedly, team leaders needed to intervene in her (Ms. Barlow's) interactions with others, many of them devolving into personality conflicts and escalating to behavior that was not conducive to a productive work environment." Managers or team leads of a different race and/or gender were inserted by Ms. Kirkland in the team after unsubstantiated claims about Ms. Barlow were raised. These individuals observed the behaviors complained of to leadership by Ms. Barlow. The persons raising the unsubstantiated claims were not removed from the project as was Ms. Barlow, were often coached to ignore Ms. Barlow's directions and to follow the white or male leads' directions. On the other hand, Ms. Barlow was often directed to show empathy, delay deliverable timelines [to afford other teammates additional time or in some cases for Ms. Barlow to perform the work of others], provide extra coaching to teammates and work on deliverables.

The Employer's guidelines for Snapshots (which are defined on page 4 of this document) is to send the request to the person to whom you report/work with day-to-day.  Ms. Barlow has followed this guideline; thus, no opportunity for selection/choices.  In difference to this guideline, Luis selected (with allowance by leadership) to send his Snapshots to Tyler and Chris even though Ms. Barlow was the lead - the one who worked with him day-to-day from the beginning of his assignment to the team i.e., daily standups and assignment of tasks.   This is very telling of Deloitte's pattern to shield others involved differently than Ms. Barlow.

## Lack of Effective Coaching from Ms. Kirkland

For the time period, 2018-2021, Ms. Barlow was under the primary leadership of Ms. Kirkland. **Ms. Kirkland consistently down rated Ms. Barlow and was of benefit in keeping ill-performing members on the team to bill for services regardless of deliverables' quality. This is Evidence of Discrimination in Ms. Barlow's Performance Feedback.**

The Employer argues that feedback was consistently noted to the Complainant since 2019 and improvement was needed.  Further the Employer indicates that Ms. Barlow was coached.  The Respondent also indicates that Ms. Barlow admitted to needing improvement in this **one** area. Though Ms. Barlow acquiesced for the sake of improving the team, no guidance of any kind was given for improvement which begs the question, **what was needing improvement**?  To the best of the Complainant's knowledge, no issue was clearly defined, no guidance for correcting or resolving what was never clearly defined. The employer never stated in the response that she asked **'how to improve'** to meet expectations. There is also *Interestingly no mention of any support or assistance to/for Ms. Barlow.*

In Ms. Barlow's letter to Talent in August 2020 [Exhibit C: Charging Party Follow-Up Letter to Employer of August 8, 2021], she mentions the conversation with Ms. Kirkland in 2019 before joining Ms. Kirkland's project in which Ms. Kirkland explained to Ms. Barlow that she doesn't know how to effectively coach on the issue as others marred her with the same feedback.

*"I expressed that I felt that I had experienced white counterparts being resistant to my attempts to foster relationships, lend understanding to me, often resist working with me and that I believed they acted that way because I was a black woman. I also noted I believe that it started to affect my reach of opportunities, even though she and I knew I was a high performer. I also shared with her how my attempts to always try to be as nice and respectful as possible. Leading with understanding, respect, confidence boosting, and empathy were the goals I strived for. She stated that, as a fellow black woman in a position of authority, she suffered with the same type of feedback and could understand this as she herself had tried to do the same things, in not being assertive, including pleasantries, and trying to keep everyone happy. However, she further noted that she never really struck a balance and continued to face it and warned me there are only so many "pleases you can say" and the work has to get done. However, she did not provide advice, strategies, or resources to help combat the racially bias perceptions of my working relationship with the team. `` In* that same letter Maria also mentions her other senior manager Yalew state in coaching meetings with Ms. Williams that everyone is "not going to like you" and that's fine.

Even with Ms. Kirkland not knowing how to help provide better coaching to Ms. Barlow, she did not seek other resources to aid Ms. Barlow in her development. Nor did her coach Ms. Williams, as Ms. Barlow was abiding by everything Mrs. Kirkland asked of her. When other counterparts are facing communication and teaming issues at Deloitte, they are often granted opportunities to obtain external executive coaching to help them acclimate better into the culture of Deloitte, especially when they are struggling. Ms. Kirkland has advocated for these types of programs for others in the past, yet did not initiate, nor provide a sightline for such efforts. From the years of 2018-2021, Ms. Kirkland sat on her hands and told Ms. Barlow to keep focused on deliverables. Ms. Williams never suggested executive coaching either. This was negligent management and leadership, especially if it impacted team operations and team members severely and required heavy intervention as the employer suggested.

## Kirkland's Influence of Project Staffing and Authority

Staffing decisions for client project opportunities are made by the Senior Managers, or PPMD of the Firm. That person is Ms. Kirkland for the client work that Ms. Barlow served from 2018 - 2021. During that time period Ms. Kirkland consistently offered Ms. Barlow project opportunities that Ms. Kirkland staffed solely. Ms. Barlow consistently was asked to aid underdeveloped talent resources. While trying to aid those underperformers, Ms. Barlow often brought up problematic behavior of team members' behavior and their resistance to collaborate. Ms. Barlow had no authority to staff and was refused to be given the tool which most day-to-day team leads had which was providing feedback through snapshots on those they supervised.

Ms. Barlow's management of teams and interactions with teams only grew outside of client work and feedback showed the **opposite** of Deloitte's position statement. Opportunities only grew to larger sets of persons managed.

## Employer's Claim That Ms. Barlow's Claims are Time Barred

Ms. Barlow communicated her retaliation and discrimination issues to the Respondent in August 2021. She had not received any communications on her investigations with Deloitte and followed up by timely initiating her EEOC charge October 25, 2021; and, timely filed her EEOC charge in January 2022. Please refer to section "Ms. Barlow's Complaints are Timely and Valid " above for full response on page 1 of this document.

The continuing discrete acts that show a lengthy pattern of discrimination before Ms. Barlow was removed from the project are outlined in the section "Continuing Discrete Violation Acts" and "Discrete Acts Continue to Happen Under The Leadership of Natasha Kirkland" sections on pages 10 and 15 respectively.

## Employer's Assertion that Ms. Barlow's Claims Related to Promotion Lack Legal Merit

This section is in response to "The Claims Relating to Promotion Lack Legal Merit" section on page 8 of the respondent's position statement. Please refer to section "The Decision Not to Promote Ms. Barlow" starting on page 6 of this document for the complainant's response.

On page 8 of the respondent's position statement, it infers that Ms. Barlow was making the most among their similarly situated peers. This information is misleading. There are also different pay scales for differences in job title from Senior consultant to Manager. Ms. Barlow's complaint is that had she not been removed from the project, and promoted on schedule with her peers, she would be compensated as a manager which is higher than that of a Senior Consultant. Her complaint also alleges that upon entering the firm men and women were compensated at different rates, with men being paid higher which affected base pay and bonuses throughout her employment. The respondent has not responded to this.

## Employer's Assertion that Ms. Barlow's Retaliation Claims are Without Merit

This section is in response to "Ms. Barlow's Retaliation Claims are Without Merit" section on page 8. Please refer to section "Ms. Barlow's Track Record of Issues with Managing Others" on page 3 of this document for the complainant's response.

# DEI Statistics of Black Woman Burnout and No Promotion

During Ms. Barlow's attendance at a Deloitte DEI Town Hall in Spring 2021, which was facilitated by the Employer's Office of DEI, a question from the floor inquired why there continues to be far less Black Women matriculating to the levels of Manager and Senior Manager than their peers and experiencing burnout. The Employer's response was that the statistics in *Deloitte Diversity, Equity and Inclusion Statistics Transparency Report* do indicate that fewer Black Women than their peers matriculate to the levels of Manager and Senior Manager and that management knew these women suffer burnout at a higher rate than their peers. Though the statistics support this fact, Deloitte does not understand the reasons for these patterns of less-than matriculation and/or burnout; and did not have a strategy for correcting and/or resolving these patterns.

These patterns have been costly for others and Ms. Barlow. The economics of a less-than normal career growth in comparison to peers and the psychological effects are imposed by this difference in treatment. For Ms. Barlow, for almost three (3) years there has been a runaround - working feverishly, endured ineffective leadership and management without lending any viable resources and/or support, producing quality deliverables in spite of non-performing and resistant team members, and eventually over-the-limit exhaustion which produced negative mental health issues which forced absence from work and modification to work schedule. Still no promotion to Manager, though led to believe that she otherwise qualified.

# Conclusion

While meeting expectations and enduring unequal treatment, Ms. Barlow performed well on her client work and led other teams to success in firm-wide initiatives. Ms. Barlow's work ethic garnered her applause awards and demonstrated a contrary track record from the employer's recounts. If there was in fact major issue with Ms. Barlow's communication or management of others, rather than affording her the support with effective coaching and/or resolution for improvement, nor intervention by management to support her as the lead, she was unfairly removed from her client project and denied promotion.

The claims of the Charging Party, Ms. Barlow, have merit. MS. Barlow was not promoted because of her race and gender, continuous discriminatory practices which culminated with being released from a project and retaliation.

Ms. Barlow was forced to take a leave of absence due to an imposed disability at the hands of the Respondent's actions. The facts set forth are descriptive of the Respondent's leadership and management and support the claims of discrimination and retaliation.

For the reasons set forth, the Charging Party respectfully requests that the charge be substantiated and that the EEOC grant all relief available including but not limited to requiring Ms. Barlow be promoted and awarding all compensatory damages, punitive damages and all costs available.

Additionally, the EEOC is requested to direct the Employer to preserve any and all materials related to this instant matter.

# Exhibit A: Charge of Discrimination

EEOC Form 5 (5/01)

# AMENDED CHARGE

| CHARGE OF DISCRIMINATION<br>This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | Charge Presented to: | Agency(ies) Charge No(s): |
|---|---|---|
| | ___ FEPA<br>_X_ EEOC | 410-2022-00525 |

| | and EEOC |
|---|---|
| State or local Agency, if any | |

| Name (indicate Mr. Ms. Mrs.)<br>**Maria V. Barlow** | Home Phone (Incl. Area Code)<br>**(313) 806-3764** | Date of Birth<br>**1988** |
|---|---|---|
| Street Address<br>**981 Mayson Turner R.D., N.W.** | City, State and ZIP Code<br>**Atlanta, Georgia 30314** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name<br>**Deloitte Consulting LLP** | No. Employees, Members<br>➤ **500** | Phone No. (Include Area Code)<br>**(404) 631-2000** |
|---|---|---|
| Street Address<br>**191 Peachtree Street, N.E., STE 2000** | City, State and ZIP Code<br>**Atlanta, Georgia 30303** | |
| Name | No. Employees, Members | Phone No. (Include Area Code) |
| Street Address | City, State and ZIP Code | |

| DISCRIMINATION BASED ON (Check appropriate box(es).) | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| | Earliest          Latest |
| **XX** RACE __ COLOR _**XX**_ SEX __ RELIGION ___ NATIONAL ORIGIN | **May 10, 2015 - November 21, 2021** |
| _**XX**_ RETALIATION ___ AGE __ DISABILITY __ OTHER (Specify below.) | ___ CONTINUING ACTION |

THE PARTICULARS ARE (If additional paper is needed, attached extra sheet(s)):

This Charge is intended to clarify and provide additional details on Charge No: 410-2022-00525. My employer removed me from a client project in January 2021 that was a primary requirement for promotion to manager without cause from my performance and at the request of a white colleague. This was regardless of managers verbal support for the advancement to manager in the fall in 2020. Management did not provide alternative placement to avoid the promotion hinderance impact.

Respondent also discriminate against me with respect to the terms and conditions of my employment because of my race (African-American) and gender (Female) discrimination and my complaints about discrimination. In particular, I believe Respondent treated me differently than my Caucasian counterparts by:

> (a) paying me less than my white male counterparts relative to my initial pay, bonuses and pay increases;

> (b) engaging in discriminatory "snap shots" and/or performance reviews;

> (c) holding me to different standards, work rules, and expectations;

> (d) undermining my value and authority by, among other things, allowing team members to bypass me and otherwise ignore my instructions;

> (e) failing to support me;

> (f) unreasonably scrutinizing my interactions with my colleagues;

> (g) chastising me for infractions I did not commit; and

> (h) otherwise treating me differently than my male Caucasian counterparts.

In February 2021 and again in August 2021, I formally complained about the disparate treatment to Respondent's Human Resources. I had previously complained to several management officials from May-October 2020. Despite my complaints, the disparate treatment continued and ultimately caused me to suffer severe emotional distress.

Respondent's actions both caused my medical condition and resulted in me being forced to take a medical leave of absence from work in April 2021.

I believe Respondent discriminated and retaliated against me because of my race (African-American), gender (Female) and complaints about disparate treatment in violation of Title VII of the Civil Rights Act and other applicable law when it: failed to promote me to a manager position; failed to pay me equally as the Caucasian men with respect to my initial pay, bonuses, and pay increases; and otherwise treated me differently with respect to the terms and conditions of my employment. The asserted reasons for Respondent's actions are pretext for unlawful discrimination and retaliation.

| | |
|---|---|
| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLANANT |
| 3/23/2022    *Maria Barlow* | |
| Date            Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |

# Exhibit B: Maria Barlow's 2021 Loop Report Feedback



## Verbatim Responses

The comments below were provided by your Feedback Providers. If your business has participated in multiple surveys this fiscal year and you did not receive a report in the first survey, this report may include cumulative responses from the prior and current survey.

**⊕ What leadership behavior does this person regularly exhibit?**

Maria has been a tremendous mentor and guide for me in many instances she has provided me with opportunities for leadership roles and business development activities. Through working with her, I have been able to learn and model my own habits after her fast practices, including her team building and management skills

You do a great job balancing detection and autonomy. I also appreciate that you take time to catch up with people during virtual meetings versus launching directly into business.

Maria is fun to work with, even on challenging tasks. She embodies the spirit of inclusive leadership and gets excited about ideas coming from junior staff

Organized and works hard

Maria communicates timely and is receptive and open to ideas of the team

builds meaningful relationships with others communicates clearly

**⊕ What leadership behaviors should this person focus on for development?**

I really don't have much here but I'd let you know if I think of anything.

If there is a new or a role or project, she shouldn't shy away from asking junior staff to help familiarize too

Being respectful and constructive when managing a differed team dynamic

Maria always has a positive and respectful approach to the team. For development, Maria can show more acumen with the teams and work-streams she leads

provide more frequent feedback

## Consulting Questions

The LOOP question set for your business is included below for your reference. All questions are aligned by theme and feedback provider type (Team Member, Coaches and Peer).
*Note: Feedback provider relationship data is not specified in your aggregate. LOOP report to protect anonymity.*

| Category | Team Leader Questions | Peer Questions | Coach Questions |
|---|---|---|---|
| Leadership | This person always excels in how they lead work and people. | When working with this person, they always excel in how they work with others. | This person always excels in how they work with me and others. |
| Growth & Development | This person always supports my growth and development (e.g. suggests new experiences/exposures, offers ideas to solve new or unique problems, encourages learning opportunities, etc.). | When working with this person, they always contribute to my growth and development (e.g. brainstorms ideas to solve problems, share relevant content, share knowledge, serve as a sounding board, etc.). | This person always supports my growth, development, and career aspirations (e.g. suggests new experiences/exposures, offers ideas to solve new or unique problems, encourages learning opportunities, etc.) |
| Feedback | This person frequently offers constructive, valuable, and transparent feedback that helps positively impact my work. | When working with this person, they frequently offer valuable input that positively impacts my work. | This person frequently helps me interpret feedback from others |
| Expectations | This person always establishes and clarifies expectations (e.g. priorities, milestones, knowledge, skills, etc.). | N/A | This person always establishes and clarifies expectations (e.g. metrics, identify strengths, what's needed for the next level). |
| Well-Being | This person always engages, actively supports, and has a genuine interest in my well-being. | When working with this person, they always support and have a genuine interest for my well-being. | This person always engages, actively supports, and has a genuine interest in my well-being. |
| Positive Environment | This person always creates a positive team environment which fosters relationships of trust. | When working with this person, they always support a positive team environment which fosters relationships of trust. | This person always creates a positive team environment which fosters relationships of trust. |
| Expertise | This person provides expertise (e.g. knowledge and experience) that adds value to my work. | When working with this person, they provide expertise (e.g. knowledge and experience) that adds value to my work. | This person provides valuable expertise (e.g. knowledge and experience) that supports my development and career |
| Inclusion | This person creates an inclusive environment where multiple points of view, working styles, and experiences are encouraged and respected. | When working with this person, they support an inclusive environment where multiple points of view, working styles, and experiences are encouraged and respected. | This person creates an inclusive environment where multiple points of view, working styles, and experiences are encouraged and respected. |
| Recognition | This person consistently appreciates/recognizes me for my contributions (e.g. shares positive feedback, celebrates my successes, makes me feel valued). | When working with this person, they consistently appreciate/recognize my contributions (e.g. shares successes with team and leaders, and makes me feel valued). | This person consistently appreciates/recognizes my contributions and the progress I have made. |
| Flexibility | This person always provides the flexibility I need to manage my work and life commitments. | When working with this person, they always support the flexibility I need to manage my work and life commitments. | This person always provides effective coaching to support the flexibility I need to manage my work and life commitments. |

# Exhibit C: Charging Party Follow-Up Letter to Employer of August 8, 2021

Hi Wendy,

Thank you for performing the investigation and sharing the results with me of that investigation. At the end of our call, you informed me that if I have any other items to bring up to you, that I could reach back out to you. Thus, I am reaching back out to you to submit a formal complaint of race and gender discrimination. In particular, I believe management has treated me differently than my Caucasian and male counterparts by:

(a) holding me to different standards, work rules, and expectations;

(b) undermining my value and authority by, among other things, allowing team members to bypass me and otherwise ignore my instructions;

(c) failing to support me;

(d) unreasonably scrutinizing my interactions with my colleagues;

(e) chastising me for infractions I did not commit; and

(f) otherwise treating me differently than my Caucasian male and Caucasian female counterparts.

I am not the only black woman at Deloitte experiencing these things. Deloitte has not and continues to not encourage or provide adequate support to black women when they are in positions of authority with teams. There is an expectation of high performance of black women in order to grow/promote in the firm; however, when in those positions, black women lack support from upper management to hold non-blacks responsible and accountable for their performance and behavior.

Throughout my entire six-year employment, I have diligently and faithfully performed my job duties and have achieved positive results. Each year I have received great feedback from the clients I have serviced and received applause awards for my work within the firm and client work. I have led teams that have met and over-delivered on expectations of leadership.

Despite my demonstrated exemplary work performance, I believe I have been unfairly judged and criticized by team members based on their bias towards a Black woman with authority. Those biases have been ratified by management through promotion and assignment decisions and they have impacted my performance snapshots. I have outlined a few examples below.

## ABE Project Experience (December 2018 - June 2019)

One example of what I believe to be race discrimination was the initial denial of placing me on the ABE project by manager Melissa Manning, which I was told was based on false and biased perceptions of my ability to work with team members.

Before joining the ABE project in December 2018, I met with Senior Manager Natasha Kirkland to talk about the role and why Melissa declined my attempt to join the project. Natasha shared that Melissa "heard that I was difficult to work with" and noted how important reputation was to my matriculation through the firm. I expressed that I felt that I had experienced white counterparts being resistant to my attempts to foster relationships, lend understanding, to me, often resist working with me and that I believed they acted that way because I was a black woman. I also noted I believe that it started to affect my reach of opportunities, even though she and I knew I was a high performer. I also shared with her how my attempts to always try to be as nice and respectful as possible. Leading with understanding, respect, confidence boosting, and empathy were the goals I strived for. She stated that, as a fellow black woman in a position of authority, she suffered with the same type of feedback and could understand this as she herself had tried to do the same things, in not being assertive, including pleasantries, and trying to keep everyone happy. However, she further noted that

she never really struck a balance and continued to face it and warned me there are only so many "pleases you can say" and the work has to get done. However, she did not provide advice or resources to help combat the racially bias perceptions of my working relationship with the team.

Natasha did, however, ultimately place me on the ABE Project despite Melissa's initial denial. Once on the project, I believe Melissa discriminated against me. Coming into an already demanding client environment at ABE, I was tasked to assist as the PMO Lead and help develop and lead 2 analysts [both white]. Leading 2 analysts, along with PMO and client-facing responsibilities, the work took over 40 hours a week. Melissa harassed me about billing over 40 hours a week, even though that is the time that it took to help both of the new account analysts and my direct client responsibilities. She declined my hours, made me justify them on a few occasions and stated it couldn't happen again. This is even on when collectively my hours were not over 40 hours for collective weeks in projected hours. Later, I discovered that the analysts were told that they were to bill 45 client hours per week regardless of them having workload or and not having work duties that required that amount of time. As the only black team member and restricted, I believe Melissa discriminated against me.

At that time, I used my network to contact Dionne Grey, a black manager, to find other client opportunities to make an impact due to the environment being restrictive and unfair to my opportunity to adequately perform, but also to make up for the weeks not allowed to work when originally rejected. Dionne found a short-term need and Natasha Kirkland allowed me to support. This required a greater level of effort for me to be stretched on two (2) projects, but I needed it to avoid utilization issues, something Melissa appeared to consider when dealing with my Caucasian team members, but not me.

Still, I continued to perform well on the project and either met or exceeded expectations, despite unsupported and unsubstantiated negative feedback about my teaming relationships, these issues started to impact my performance reviews. Yolanda could see a stark comparison in my performance reviews from that under Melissa as compared to my other managers. At that time Natasha continued to verbalize her support for my early promotion to manager during my check-ins with her. Under both capacities my level of performance of delivering work and leading the team was never in question or brought to my attention.

<u>DHAP Project Experience (November 2019)</u>

I joined the DHAP Project in November 2019 and faced many challenges with team members having difficulty taking directions from me. I believe their difficulties were based on the fact that I'm a black woman that held them accountable for quality work.

In numerous check-ins, I asked what I could or should do to improve relationships, better support the team (Reagan in particular) and make the teaming environment better. I was never met with significant advice or support. Instead, a white male manager (either Chris or Tyler) was inserted to create a buffer or provide direction to the team, which minimized my value and undermined me as a leader. Even with "improvements" and "strengths" that you noted from your investigation, I was never equipped with the resolution; yet my managers continued to essentially ratify the biased perceptions and, even worse, engage in unethical practices of approving fraudulent work hours in support of my white counterpart on the project. Reagan was given time to take days off, often never fulfilling assignments in a timely or quality manner, required work-arounds and hiring staff to support her duties, all while consistently billing the client 40 hours a week. This is an example of holding me to different standards, work rules and expectations.

I mentioned how unfair to carry this was consistently to Natasha, Tyler, and Chris. Natasha and Tyler even called Reagan "ineffective" in front of me during a meeting; indicating they knew she was problematic; but did nothing to improve the team environment. The support I received to correct my "problematic behavior" was always to stay away, not talk about work, and don't engage her. My male Caucasian counterparts were not given the same direction as a result of holding their team members accountable.

This type of advice is avoidant, does not empower me to take a leadership role with my team, allow me to perform at the next level (required for promotion), hold team members accountable, and it stimulates an environment that produces unethical behavior which subjected me to a hostile and unsupported work environment. After initially working

with me well, team member Luis recognized that my authority was undermined and began only responding to Chris or Tyler's direction on projects. He also declined meetings with myself, and otherwise refused to allow me to lead or engage in team discussions I led. I was the only team member to face this type of resistance for both Luis and Reagan to work with.

Although I have provided documentation of unethical and problematic behaviors of team members, including resistance, disrespectful behavior, lack responsibility and accountability for timely and quality work, management did not hold these employees to the same standards and instead chose to chastise me for trying to hold employees accountable. This is particularly troubling because management failed to communicate to me what exactly I did or have done to result in team members not working differently. Despite the challenges I kept performing for the client and we only received positive reviews for the work that was delivered to the client.

Yolanda could see another stark comparison in my performance reviews under manager Tyler, with the flagging of a negative midyear review with no substantiation; and, even though Dionne was the day-to-day manager before her departure in May. Under both capacities my level of performance of delivering work to the client and leading the team was never in question or brought to my attention.

Lack of Support and Specific Advice from Immediate Managers

I was consistently treated differently and have received a lack of support from Deloitte Leadership. Despite my belief that the perceptions of my teaming skills were biased and racially motivated, I welcomed the opportunity for growth and development. Indeed, management always heard my openness in reciting to them what is it that needs to be done; do you know what needs to be done; and, more so, certainly, all I want to do is to rectify the issue - and, in most cases without even knowing what the issue is- how do we resolve? I was consistently met with advice to avoid work conversation, not actively be the lead, and allow a white manager to intervene as a buffer - rather than receive work from a black female senior consultant lead. Each one of my managers either provided ineffective advice or contributed to me being treated differently; both in denying me the activities necessary for my advancement and performance of my basic job function, as well as not being transparent about teaming expectations or any clear strategy in resolving issues stemming from myself and/or others. The result was traumatically impactful for me in getting the runaround and hitting roadblocks.

Natasha Kirkland, Senior Manager

During both the ABE and DHAP project with Natasha leading as Senior Manager, we often had check-ins where we discussed junior staff members and my teaming status with them. Often judging my performance on how "well liked" the team members felt about me, rarely based on client work performance, which I excelled in. Natasha often asked me to copy her and other managers on communications; however, never provided effective conflict resolution, provided advice or resources to use to help with the issue of resistance or to help with the biased reputation of bad teaming environments. Natasha never suggested the issues may stem from other team members even though there was evidence of their conduct. The workload coupled with the lack of support or team accountability continuously affected me, and I raised it often. No other alarming conduct of my own was brought to my attention.

Natasha also observed my interaction with other team members in the CREW as she was an advisor for the Talent Experience. Never did she bring up any teaming issues with my teaming with those teams either.

Yalew Meherka, Senior Manager

I worked with Yalew the first 3 years of joining Deloitte. I always had exceptional client reviews and spearheaded professional development for junior practitioners of Federal Finance at CDC. He was the Senior Manager on the contract I worked on in the Office of Appropriations which was under PPD Eric Nelson.

During my time in the Office of Appropriations, Leah and I had an ad-hoc assignment to once in a blue moon collaborate with Chris Kipreos, a white male analyst, on an assignment from the clients. The meeting we were attending was to bring together each of our sections back together, discuss, and strategize next steps. After Leah and I both

presented our parts via screen share, Chris discussed his piece verbally. His part seemed to not meet the objectives that we set forth at meetings before and would still need work before we went back to the client. He stated that he hadn't had enough time to work on the assignment and was currently in Target shopping for a personal gift. I stated, "Thanks for letting us know " and followed up with when could we meet again, when he had an opportunity to give it more time. Leah told me that Chris didn't like the way I spoke to him but brushed it off as it may have been what he's been dealing with from the day. Yalew also questioned me "what did you do to Chris"? I was looked at as if I hurt this person's feelings, and authoritatively by saying "Thanks". There was no expectation of Chris to send a note before, or to preform due diligence and ask to reschedule the meeting which could have easily been done. Yet a perception that I was being mean.

After 3 successful years, I announced my want to move onto experiencing other opportunities outside of the Office of Appropriations and a backfill for my role was resourced, who was Brandon M, a white male. Upon arrival we began the transition of my budget formulation knowledge to him in learning sessions.  Leah Walden, Manager, and I both noticed Brandon's resistance to being alert in the meetings, often distracted doodling, staring off into space, never asking questions and not being able to understand most recently given information. I noted this to Yalew at the time. It was brushed off.  I kept my dates to transition rather than to face my concerns, knowing my client would suffer because of this.

A few months later, I caught up with a client over lunch. My client noted that while at lunch with another white co-worker and Brandon, he [Brandon] stated a few derogatory comments about black people including "***Black Bitches***" he had to interact with at work during a visit to a store that weekend. The client who told me this was of minority descent and was offended and disturbed. I brought this to the attention of Leah and Yalew and let them know it impacted me because of the way he treated my time, and they both said they would investigate the issue further; yet I never heard any information yet alone anything conclusive, on the results of that investigation. Brandon was able to continue that role, never reprimanded and I, when I have had to work with him in proposal environments, he is unsupportive and resistant in teaming. I have just stayed distant from the relationship with Yalew and Leah knowing they have seen these things and hadn't done anything about it.

During the recent performance year, I was attempting to receive consensus from all my managers for the promotion to Manager for myself. Yolanda and I met with Yalew, and he confirmed his support for me to become manager, as we worked closely on the Enterprise Performance Portfolio Offerings Solutions Fair and closely worked with me managing the team of 10. He knew of the past word of mouth, unsubstantiated statements of difficulty, and indicated that some people will like you and some people won't. He also indicated that client project managers were instructed to rate practitioners that are to be promoted through snapshots for 75% of the time to be considered per Brian Siegel. This flagged the attention of Yolanda and myself because if I was not substantially flagged for midyear negative review, why then was I not to be considered for promotion. Only after my report for investigation was Yolanda notified that she needed to present me for consensus promotion evaluation, before I was not put on the list of Senior Consultants to be reviewed for my Service Offering. The impact had already been done to the story I worked hard for due to unsubstantiated claims and snapshots.

<u>Yolanda Williams</u>

My counselor aided in trying to develop me through both ABE and DHAP projects and actively checked with my day-to-day managers, Melissa Manning, Patrice Lindo, Jennifer Camp, Dionne Grey, Tyler Burbridge, Chris Long, Natasha Kirkland and Yalew Meherka. Specifically, white managers, Melissa, and Tyler, never brought up any teaming issues with her. When noticing the noticeable difference from discussions with snapshot ratings, she recommended having conversations with her [Yolanda] to better document the discussions and actual performance on expectations to secure advanced consensus. This is why we met with Senior Managers and Managers together in November and December 2020. However, the gaslighting impacts were already in the snapshots.

<u>Chris Long, Manager</u>

To receive consensus from my managers for the promotion to Manager, Chris also met with Yolanda and I for feedback and advice. He also supported my promotion for manager and admitted that I had helped the project improve and that he advised me to "not talk about work" to improve the work environment with Luis and Reagan. In the end, he

and Natasha indicated that because of the required level of involvement from Chris due to teaming issues, it's better for him to manage the work exclusively since it seemed that I could not get the team to have a non-resistant experience. I again believe this undermined my authority and worth and otherwise hampered my ability to advance. Particularly since Chris' instructions to the team were similar to mine. The only difference was Chris is a white male and I am a black female.

### Tyler Burbridge

I mentioned to Tyler my goals were to become Manager and first met to check-in. I told him I routinely check-in with Natasha; so, he stated we didn't need to have consistent check points due to us meeting consistently with team and clients. He often complimented our sessions with the clients and my work and that I was taking care of everything and had no concerns. He never mentioned issues with teaming with me, and I often shared with him from his entry how disrespectful Reagan was and resistant outside of his presence. Natasha asked that he step in and give assignments to her; however, he failed to do that and check-in with her timely and provide feedback to her on her performance. His attitude towards me when I raised this concern became aggressive, dismissive, and unsupportive. His steamrolling of my escalations for help traumatically impacted me. He left the company shortly after. I escalated to Natasha, as previously reported but continued to feel helpless due to her inaction.

Managers appear to place billing clients, whether correctly or incorrectly, as a priority; however, accountability to integrity is not supported when a black female practitioner stresses accountability by her team.

### PPMD Spencer Hollis

I requested a compensation statement conversation in September 2020, by the advice of my account leadership Sabine Awad. The request was routed to Spencer Hollis, a Managing Director of the GPS practice. Spencer conducted his due diligence on my performance before speaking with me and greeted me with a congratulatory tone on successes with client and firm work and for having my network excited about the impacts I have been making. He also stated that I was making compensation at the lower end of the band for my role, which was a bit off because my impacts held such accomplishment and weight. He expressed that my managers were not following through with performance ratings in my performance snapshots.

He suggested and I followed up with meetings with all my immediate managers to explicitly set expectations, for "strong" and "exceptional", and to make sure I hit exceptional.

My client managers, including Natasha and Tyler, consistently provided verbal statements that did not align with their performance snapshots I received. The fact of this matter caused my counselor, Yolanda, to intervene to hold them accountable. Even with this, and not being able to substantiate the specific behavior that I allegedly exhibited, I was still removed from the project and opportunities aligned with my impending promotion, all while delivering in every other area exceptionally. Unfortunately, I, nor Deloitte, could hold my network accountable for their mixed statements for this subjective and biased teaming metric, furthermore it was not met with adequate support in realistic goal setting or to receive adequate support to meet those metrics.

### How This Impacts Me as a Practitioner

The avoidance management style has not proven to be effective, nor inclusive of producing a work environment that supported the goals of all team members nor evenly distributed work. Support did come for my white team members, requiring that they only work with white counterparts; and even alleviated workload(s) or quality and timely delivery of work.

I was kicked off the project because I was a black woman, and they did not want to be accountable to a black woman. Yet they were willing to work for white managers without issue. This fact has hindered me in excelling and drained me from performing with the lack of support, and mentally exhausted me from trying to find answers that no one seems to have at this point in time. This is how my immediate client work network has contributed to the discrimination against me.

## Conclusion

As the environment persists as-is, each episode impacts myself greatly, and it leaves me helpless without support from managers who are only attempting to increase profitability, limit level of effort to team issues, and are not required to understand that avoidance and isolation hinders a practitioner's abilities to grow and discourages black women to strive for management roles. As well as removal of a high producer without unsubstantiated claims coupled with non-due diligence or effective resolution of expectation that everyone does their part, ONLY limits the quality of the work product to the client. However, me the high producer was used and dismissed, with development denied in all areas. The complaints/comments of non-Black counterparts reflect no expectation of substantiation of claims of teaming issues, as well as does not hold team members accountable for quality work product responsible in their respective roles. Even when it was not my direct responsibility to lead [having the title or designated title] I have stepped up to persevere and move the project to the finish line each time. There has been no evidence to date that the behavior of my assigned management is expected to or even attempt to change; thus, the impact on me will continue unless adequate support is required and given.

Support from Deloitte's Leadership and my network has failed me. The result is Deloitte received high performance from me, development of projects and in some cases, the development of junior members; but I am on disability dealing with the residuals of these traumatic experiences capstoned with the DHAP project experience, denial of continued growth with title yet in work. I was recruited by Deloitte; came to Deloitte and have given professional, high-performance, and accepted challenges and barriers. Unashamedly and openly asked for assistive support in all areas of my roles; but have been met with unsubstantiated concerns, resistance of non-Black team members and managers, non-specific reasoning for not obtaining a manager title [though verbally told that I would be recommended by the appropriate upper management for the manager title] and remain with impacts that I have never, ever experienced in my life.

Lastly, I am requesting an investigation into my complaints of discrimination, as well as assurances that I will be treated fairly with an equal opportunity to succeed, and that management will not retaliate against me because I submitted this complaint.

In closing, I reiterate that, despite my concerns about discrimination, I remain committed to improving my soft-skills and to otherwise meet Deloitte's reasonable expectations.

Thank you.

Maria Barlow

# Exhibit D: EEOC Notice of Right to Sue

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Atlanta District Office**
100 Alabama Street, SW, Suite 4R30
Atlanta, GA 30303
1-800-669-4000
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS

(This Notice replaces EEOC FORMS 161 & 161-A)

Issued On: 12/08/2022

To: Miss Maria V. Barlow
    981 Mayson Turner Rd. N.W.
    ATLANTA, GA 30314
Charge No: 410-2022-00525

EEOC Representative and email:    Esther Holm
                                  Federal Investigator
                                  Esther.Holm@eeoc.ov

---

### DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 410-2022-00525.

On behalf of the Commission,

Digitally Signed By:Darrell Graham
12/08/2022

**Darrell Graham**
District Director

Cc:
Susan Pugatch
DELOITTE
1221 Avenues Of The Americas 40th Floor
New York, NY 10020

Please retain this notice for your records.

15.    Plaintiff    ✓    still works for defendant(s)

                                      no longer works for defendant(s) or was not hired

16.    If this is a disability-related claim, did defendant(s) deny a request for reasonable accommodation?    ___  Yes    ✓    No

        If you checked "Yes," please explain: Defendant caused the plaintiff to experience disability due to discrimination.

Defendant is currently accommodating disability.

17.    If your case goes to trial, it will be heard by a judge unless you elect a jury trial.  Do you request a jury trial?    ✓    Yes  ___  No

## Request for Relief

As relief from the allegations of discrimination and/or retaliation stated above, plaintiff prays that the Court grant the following relief (check any that apply):

| | |
|---|---|
| ✓ | **Defendant(s) be directed to:**<br>1. Promote me to manager retroactively to September 2021<br>2. Provide me with executive coaching from a coach of my choosing for 2 years<br>3. Give support to Black Women specifically serving in the Atlanta area |
| ✓ | **Money damages (list amounts):**<br><br>**Compensatory ($1,249,043+)**<br>1. Retroactive payment for discrimination and paid less than peers of same level and performance 2015 - 2021 – $151,852<br>2. Retroactive payment for wages adjusted for disability impacts from discrimination from 4/19/2021 to current date – $111,502+<br>3. Retroactive payment for insurance while on COBRA (12 month leave) – $2941<br>4. Retroactive payment for hinderance from conducting business at Manager Levels at CDC - 4 Years salary at rate of Manager - $892,748<br>5. Ancillary Employee Benefits - $40,000<br>6. Provide me with executive coaching from a coach of my choosing for 2 years - $50,000<br>**Punitive Damages ($300,000)**<br>7. Requesting $300,000 |
| ✓ | **Costs and fees involved in litigating this case:**<br><br>1. Legal fees associated with EEOC Process Legal Fees - $8000<br><br>2. Any fees associated with filing, processing, attorney, and litigation fees |
| ✓ | **Such other relief as may be appropriate** |

## **PLEASE READ BEFORE SIGNING THIS COMPLAINT**

Before you sign this Complaint and file it with the Clerk, please review Rule 11 of the Federal Rules of Civil Procedure for a full description of your obligation of good faith in filing this Complaint and any motion or pleading in this Court, as well as the sanctions that may be imposed by the Court when a litigant (whether plaintiff or defendant) violates the provisions of Rule 11. These sanctions may include an order directing you to pay part or all of the reasonable attorney's fees and other expenses incurred by the defendant(s). Finally, if the defendant(s) is the prevailing party in this lawsuit, costs (other than attorney's fees) may be imposed upon you under Federal Rule of Civil Procedure 54(d)(l).

Signed, this 3nd day of March, 2023

(Signature of plaintiff *pro se*)

*Maria Victoria Barlow*

(Printed name of plaintiff *pro se*)

*1029 Oak Street SW*

(street address)

*Atlanta GA, 30310*

(City, State, and zip code)

*Barlow.mv@gmail.com*

(email address)

*313-806-3764*

(telephone number)